STATE of Minnesota, Respondent,

v.

John D. KUMPULA, Appellant.

No. C3–82–1034.

Supreme Court of Minnesota.

Sept. 21, 1984.

C. Paul Jones, Public Defender, Ronald E. Hunter, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka Co. Atty., Robert A. Stanich, Asst. Co. Atty., Anoka, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury of aggravated robbery and assault with a dangerous weapon, Minn.Stat. §§ 609.11, subd. 1, 609.222, and 609.245 (1980). These charges were based on the May 8, 1981, armed robbery of a drug store in Hilltop and the assault of a person during the getaway. The trial court sentenced defendant to prison terms of 81 and 54 months for the aggravated robbery and assault, with the terms running consecutively to each other but concurrently with a prior sentence for which parole was revoked. On appeal, defendant seeks an outright reversal because the evidence of his guilt was legally insufficient or a new trial because the omnibus court erred in denying his motion to suppress and the trial court erred in admitting *Spreigl* evidence and certain pictures which defendant contends were irrelevant and unfairly prejudicial. We affirm.

On April 27 or 28, 1981, defendant, then 27, was released from prison, where he had been incarcerated for an aggravated robbery of a drug store. After being at a halfway house only 2 hours, defendant left without authorization.

On May 4, 1981, defendant, in the company of a woman, was observed shoplifting cologne at a store in a shopping center in Blaine. When store employees confronted defendant and the woman in the lot, defendant pulled a knife and, after swinging it at one of the employees, fled. When a store employee began pulling the woman into the store, defendant returned and threatened to cut the man if he did not release her. The employee then released her and she joined defendant in a car and they drove away. Store employees obtained the car's license number. Defendant was wearing sunglasses and had a mustache at the time of the incident.

On May 6, 1981, Rolland Johnson, a criminal investigator with the major crimes unit of the Anoka County Sheriff's Office, went to an apartment building in Hilltop as part of his investigation of the theft and assault with a dangerous weapon at the shopping

center. Johnson had information that defendant's girlfriend, Mary Sanders, lived there. The caretaker said that Sanders rented apartment No. 201 but that her rent was overdue and that he was uncertain whether she was still living there. He told Johnson that he wanted to go in there but was afraid to do so and he asked Johnson to accompany him. Johnson and the caretaker went to the apartment and entered with a master key. It appeared to them upon entering the kitchen that the apartment was still occupied. On the kitchen table Johnson saw narcotic paraphernalia, including syringes and cotton balls stained with blood. They walked from the kitchen into the bedroom and from the bedroom into the living room. In the living room closet Johnson saw, among the clothes hanging there, an army-green jumpsuit. In a box in the closet he found personal papers of defendant.

At 8:30 a.m. on May 8, 1981, a person armed with a small automatic handgun committed an armed robbery of Snyder Drug Store at 45th and Central Northeast in Hilltop. There were three employees in the store at the time: the pharmacist, the manager, and the custodian. Only the pharmacist got a look at the robber, who crouched out of view of the other employees during the robbery. She could not tell the sex of the robber, who was dressed in an army-green, long-sleeved one-piece jumpsuit, a cap that covered both the head and face, and who was wearing gloves and glasses with clear lenses. The robber was a relatively small person, approximately 5 feet 7 inches tall. The robber wanted only schedule II narcotics, which the pharmacist put in a pillow case the robber was carrying.

At least two people told the police that they saw the robber fleeing the scene. One, Bernice Alain, did not get a look at the robber's face and could not say if the robber was wearing a mask. She described the robber as wearing an army-green, long-sleeved one-piece jumpsuit or coverall and a green or gray cap. She testified that the person was not big, maybe 5 feet 3 inches

or 5 feet 4 inches tall and not over 150 pounds.

The other witness, 28-year-old Steven Saba, a self-employed tow truck operator, was driving south on Central in his tow truck when he saw the robber running north toward a trailer court. Suspicious, he pulled into a driveway and asked Bernice Alain if she thought it was a robber, as he did. He then gave chase in his truck and confronted the person, whose face no longer was covered. Saba asked the person, a man, what he had in his bag. The man said that it was his medication. When Saba asked if he could see it, the man said no. The man then said that he had something to show Saba and proceeded to pull out a small handgun. Saba then ducked down and put the truck in reverse, let the clutch out, and began driving backwards away from the man. The man chased after him briefly, then turned and ran into the driveway of the apartment complex where Investigator Johnson had been looking for defendant on the 6th. Saba described the man as wearing army-green coveralls, a stocking cap, and sunglasses and as having a sandy-blond mustache. A composite drawing of the man, assembled by Saba and police using a so-called Identikit, was admitted into evidence. Saba apparently told the officer who helped assemble the composite drawing that the man was about 30 years old, 5 feet 10 inches to 6 feet tall, and 180 pounds.

Shortly after the robbery, Investigator Johnson talked with Kelly Jean Heiner, a tenant who resided down the hall from the apartment leased to defendant's girlfriend. Heiner told Johnson and testified at trial that she had heard someone leave either apartment No. 201 or 202 and that she had looked out the window into the parking lot and had seen a person wearing a green long-sleeved jumpsuit and a cap of some sort and had seen the person put on sunglasses. She testified that the person appeared to be fairly tall and was thin and that although she could not tell the sex of the person she thought it was a woman. The person walked in the direction of the drug store, which is just a short distance

from the apartment building. It appears likely that these observations were made shortly before the robbery.

The officers put the apartment under surveillance, and Investigator Johnson applied for a search warrant. The affidavit in support of the application summarized the facts known about the robbery; summarized the information received from Heiner; stated that the tenant of apartment No. 201 was defendant's girlfriend and that defendant had recently been released from prison on parole from a sentence for armed robbery and had left a halfway house without authorization; summarized the circumstances of Johnson's entry of the apartment on May 6; and stated that Johnson had seen the narcotic paraphernalia on the kitchen table and the army-green coveralls in the closet.

Meanwhile, at 11:30 a.m., officers who had the apartment under surveillance arrested Mary Sanders when she left the apartment. She was released later that day when her alibi (that she was in a conference with school officials concerning her daughter) was corroborated.

The magistrate issued the warrant, and the officers executed it at about 1:30 p.m., finding and seizing an empty holster for a small handgun, a pair of sunglasses, some pills belonging to Mary Sanders, and some papers and pictures belonging to defendant. The sunglasses and the pictures were admitted into evidence at defendant's trial.

Defendant was arrested in Hennepin County on a separate charge on July 3, 1981. On August 3, 1981, a lineup was held. At this lineup two employees involved in the incident on May 4 identified defendant as the person who stole the cologne and used the knife to facilitate his getaway. Steven Saba identified defendant as the man he confronted on May 8 after the drug store robbery in Hilltop. These same witnesses identified defendant at trial. Pictures of the lineup, which were admitted in evidence, reveal that defendant had a mustache at the time of the lineup.

The state's evidence at defendant's trial was basically as we have summarized it,

except that the jury was not told about defendant's prior robbery conviction or that he was on parole at the time of the incident. The trial court admitted the evidence concerning the theft and assault at the shopping center in Blaine on May 4 as *Spreigl* evidence.

Defendant, who by the time of trial had changed his hair style and shaved off his mustache, did not testify but called Mary Sanders and her sister Karen, who resided in the apartment with her, as well as her sister Joan, who resided in south Minneapolis. These three women testified that defendant was residing with Joan in her south Minneapolis apartment and was with her at the time of the robbery. Mary Sanders testified that on May 8 defendant looked just like he looked at the time of the trial, *i.e.*, that he had short hair and no mustache. The defense tried to show that another man, who was accused of two other drug store robberies, might have committed the Hilltop one also.

■ 1. Defendant's first contention, that the evidence of his guilt was legally insufficient, is without merit. The testimony by Saba, the only witness who saw the robber's face, was positive and unimpeached and was corroborated by (a) the testimony of Heiner, who saw someone who fit the description of the robber leave apartment No. 201 or 202 that morning and walk in the direction of the drug store; (b) the testimony of Saba that he last saw the robber headed toward the apartment building; (c) the observations of Investigator Johnson, made on May 6; (d) the evidence concerning the holster and pictures seized from the apartment on May 8; (e) the evidence that the tenant of the apartment, Mary Sanders, was at her daughter's school at the time of the robbery; (f) the evidence that defendant fit the description of the robber, particularly that he had a mustache; (g) the evidence that Saba identified defendant at the lineup; and (h) the *Spreigl* evidence.

2. Defendant's next contention, that the omnibus court erred in denying his motion

to suppress, is based on the conduct of Investigator Johnson on May 6.

The first issue in this connection is whether defendant had standing to complain about the search of the apartment on May 6. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the United States Supreme Court held that in determining whether a defendant is entitled to challenge a search as violating the fourth amendment, the Court should concern itself with whether the defendant had a legitimate expectation of privacy in the area searched. The Court held further that the fact that defendant was legitimately on the premises at the time of the search is not by itself determinative, but is one of many relevant facts bearing on its determination of whether the defendant had a legitimate expectation of privacy in the area searched. The Court reaffirmed that one can have a legitimate expectation of privacy in a place other than his own home, pointing to *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), as an example. The Court stated that the defendant in *Jones* had permission to use the apartment in question; that he kept possessions there; that he had a key with which he admitted himself on the day of the search; and that, except with respect to the lessee, he had complete dominion and control over it and could exclude others from it.

■ Whether defendant had a reasonable expectation of privacy in the entire apartment in question is a close issue. It appears that he had a key to the apartment (he testified that he did, and he must have had one in order to get in there to put on the jumpsuit when Mary Sanders was at school). Further, Mary Sanders apparently was his girlfriend, and it is highly likely that she would share her apartment with defendant. On the other hand, defendant testified at the omnibus hearing that he had spent only one night there, then had started staying with Mary Sanders' sister in south Minneapolis, apparently because he feared the police would find him at Mary's apartment and arrest him as a parole violator. On these facts, we believe that while defendant may not have had a legitimate expectation of privacy in the entire apartment, he may well have had a legitimate expectation of privacy in the box which he left in the closet.

■ If this is correct, then the court was justified in letting Investigator Johnson testify as to his observations of the jumpsuit in the closet on May 6 but was not justified in letting him testify about his observations of the contents of the box. Investigator Johnson was justified in accompanying the caretaker to the apartment on May 6, since the caretaker, who apparently had a legal right under the lease to enter the apartment, was genuinely afraid and wanted Johnson to be there to protect him. *See Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) (fourth amendment proscribes only governmental action); *United States v. Coleman*, 628 F.2d 961 (6th Cir.1980) (holding that police conduct in standing by in case of trouble did not convert repossession of pickup truck by private party into state action where police did not encourage or direct the repossessor to repossess the truck but were present only at his request); 1 W. LaFave, Search and Seizure § 1.6(b) (1978). It appears that Johnson would have seen the drug paraphernalia on the kitchen table and might well have seen the jumpsuit hanging in the open living room closet. Investigator Johnson, however, did more than just accompany a frightened caretaker to see if the apartment had been abandoned and he did more than just keep his eyes open. He entered the apartment and searched it, rummaging through a box of personal papers belonging to defendant. We see no justification for this.

■ Any error, however, in admitting evidence of observations that Investigator Johnson made on May 6 was nonprejudicial, since the state still would have been able to connect the robber to the apartment by the testimony of Heiner and Saba. The state would also have been able to connect defendant to the apartment through the pictures found in the independently justi-

fied search of May 8. *See State v. Hodges,* 287 N.W.2d 413 (Minn.1979) (search warrant affidavit contained information obtained illegally by police during a search of lessee's property consented to by lessor, who did not have authorization to give such consent; however, exclusionary rule did not require suppression of property seized during warranted search because there was lawfully obtained information which independently supported issuance of the warrant).

■ 3. Defendant's third contention is that the trial court erred in admitting the *Spreigl* evidence.

Minn.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As stated in *State v. Filippi,* 335 N.W.2d 739, 743 (Minn.1983):

The preferred approach to applying this rule is to analyze the evidence and determine if the evidence is relevant and material to the state's case, if the evidence of the defendant's participation in the offense is clear and convincing, and if the probative character of the evidence outweighs its potential for unfair prejudice. [Citation omitted.]

In determining relevancy, we have generally required that the other crime be similar in some way—either in time, location, or *modus operandi*—to the charged offense, although this, of course, is not an absolute necessity.

*Filippi* exemplifies the flexibility permitted in determining relevancy. The defendant there was charged with burglary and two counts of assault with a dangerous weapon for shooting at two police officers who surprised the defendant and his accomplice during a nighttime burglary of a drug store. At trial the defendant claimed that he was not armed, did not know his accomplice was armed, and did not participate in the shooting. The trial court admitted evidence that 4½ years earlier in Wisconsin the defendant, while participating in an armed robbery, did not personally possess a gun but relied on his accomplices to do so. In upholding the admission of this evidence we stated:

In this case the defense argued in the trial court and argues on appeal that the fact that defendant was unarmed showed that he did not actually foresee that there might be an assaultive confrontation with police. The other-crime evidence arguably was particularly relevant in this respect: it showed that even when defendant clearly foresaw that a confrontation would occur, as he did in the 1976 robbery, he did not personally possess a gun but relied on others to do it. Thus, the evidence removed the logical foundation for one of the arguments advanced by the defense in its attempt to persuade the jury that the defendant did not know and could not foresee that [his accomplice] would be armed.

The fact that the prior offense was a robbery rather than a burglary and the fact that it occurred in Wisconsin do not necessarily make the evidence irrelevant. Similarly, the fact that 4½ years separated the two offenses is not necessarily significant, since defendant was in prison for a good part of those 4½ years and therefore was, for the most part, incapacitated from committing crimes. [Citations omitted.]

The real issue, in our opinion, is whether the relevance of the evidence was sufficient to outweigh its potential for unfair prejudice. We agree with the trial court that the issue was close. Trial courts have a degree of discretion in such close cases, and we cannot conclude that the trial court erred in exercising that discretion.

335 N.W.2d at 743–4.

In this case the prior offenses were theft followed by an assault with a knife committed by defendant on a person trying to hinder his flight; the charged offenses

were aggravated robbery followed by an assault with a small handgun committed by defendant on a person trying to hinder his flight. The prior conduct occurred in a shopping center in Blaine; the charged offenses occurred in Hilltop, which, like Blaine, is in Anoka County north of Minneapolis. The prior conduct occurred on May 4; the charged offenses occurred on May 8. The admission of the evidence of the prior conduct was relevant in a number of ways: it showed that defendant was in Anoka County on May 4, just 4 days before the robbery; it showed that he had a mustache; it showed that when he was confronted by someone after committing a crime he did not hesitate to use the dangerous weapon he was carrying. We conclude that the trial court did not err in determining that the relevancy of the evidence was sufficient to outweigh its potential for unfair prejudice.

4. Defendant's final contention relates to the trial court's admitting the photographs seized in the warranted search on the 8th.

There were a total of 18 pictures. Among the photographs were (a) a small formal portrait of Mary Sanders, framed in a cardboard frame, on which is written, "Johnny, Love you always, Mary '80"; (b) three candid pictures of defendant with friends, all apparently taken in 1977, each showing defendant with a mustache; (c) two candid pictures of defendant alone, one taken in 1977 and one in 1980, each showing defendant with a mustache; and (d) two candid pictures of defendant with an arm around Sanders, one without a date, the other dated 1980, each showing defendant with a mustache.

■ Contrary to defendant's argument, the relevance of the pictures is obvious. The fact that they were found in Mary Sanders' apartment tended to tie defendant to the apartment. Further, three of them suggest strongly that defendant was Mary Sanders' boyfriend, thereby tying him even more to the apartment and to the robbery. Finally, they show that whenever he had his picture taken he had a mustache.

■ Only one of the pictures was arguably unfairly prejudicial. That is one showing defendant with his shirt off, dressed in rolled-up jeans, athletic socks and athletic shoes, standing in an outdoor setting with his arms folded. Thirty to 40 feet behind him is a fence with barbed wire on top. Behind the fence is part of a large brick building. Defendant claims that one can see bars on the windows of the building, but we disagree. The building looks like it could be an old school building or an old factory. In fact, it is one of the buildings at the prison in Stillwater. Written on the front of the picture are the words, "On the yard—6–10–80—Bad Photo—Johnny K." Arguably, the trial court should have excluded the photograph, since there was a remote possibility that the jury might speculate that it was taken in prison and since there was another picture of defendant showing him with a mustache in 1980. We do not believe, however, that the trial court prejudicially erred in admitting the picture. The chance that the jury might have wondered whether the picture was taken at a prison is remote, particularly since the other picture taken in 1980 seems to have been taken in a domestic setting (in fact, defendant and Sanders are wearing twin T-shirts). Secondly, if the jury guessed that defendant had a prior record, it is more likely to have based that guess on Mary Sanders' statement on redirect examination by defense counsel that the police told her that "they wanted to make sure that [defendant] never got out again."

In conclusion, we hold that defendant received a fair trial and was properly convicted of aggravated robbery and assault with a dangerous weapon.

Affirmed.