**STATE of Minnesota, Petitioner, Appellant,**

v.

**William Walter AXFORD, Respondent.**

**No. C7–86–1904.**

Supreme Court of Minnesota.

Dec. 18, 1987.

Rehearing Denied Jan. 15, 1988.

Hubert H. Humphrey, III, Atty. Gen., Paul P. Kempainen, St. Paul, Bruce Gross, Cottonwood Co. Atty., Windom, for petitioner, appellant.

Ellis Olken and Nancy Olken, Minneapolis, for respondent.

AMDAHL, Chief Justice.

Defendant was found guilty by a district court jury of two counts of criminal sexual conduct in the first degree for sexually abusing his granddaughter over an extended period of time. Minn.Stat. § 609.342, subd. 1(h)(v) (1986). The court of appeals granted defendant a new trial on the ground that the trial court prejudicially erred in admitting evidence that defendant's son, the victim's father, was also sexually abusing the victim during part of the same time period. *State v. Axford,* 409 N.W.2d 893 (Minn.App.1987). We reverse the decision of the court of appeals granting defendant a new trial and remand the case to it for consideration of issues left undecided by its decision.

The victim, K., is the daughter of defendant's son Mark. K.'s mother and father were divorced in 1982 when K. was 10. Mark lived in Hopkins most of the ensuing years. The mother, K. and K.'s two siblings lived in a number of different cities, Montevideo, Marshall, Mankato and St. Peter. The children typically spent every other weekend with Mark, often at the home of Mark's parents—*i.e.,* at defendant's home—in Windom.

In the spring of 1985, while living and attending school in Marshall, K. wrote notes which she passed to three girl friends saying that she did not like her mother, that she wanted to live with her father, and that her grandfather was sexually abusing her. The girls who received these notes kept the information confidential even

though in one of them K. asked the girls to tell the school counselor.

Shortly thereafter K. again moved with her mother and siblings, and the mother began working at C.A.D.A. House, a safe house for battered women and children in St. Peter. This move occurred around the time that K.'s father, Mark, remarried.

On January 15, 1986, K.'s mother and the children sought shelter in C.A.D.A. House because of threats that Mark allegedly was making against the mother, threats apparently related to a custody dispute. Following standard practice, Debra Johnson, a children's advocate at the home, interviewed K. When Johnson asked K. if there was anything she was afraid of, K. said she was afraid of suicidal thoughts that she had been having. She then started sobbing and revealed that her father's father—i.e., defendant—was sexually abusing her, that it had started when she was 10 years old, and that it consisted of fondling, oral sex and sexual intercourse. Johnson asked her twice if anyone else had touched her in an inappropriate way or abused her, and K. said that her father also had been touching her sexually. They also talked about problems that K. said she had been having with her mother.

Johnson reported the abuse to St. Peter police, who in turn called in the Windom and Hopkins police, who interviewed K. A doctor who examined K. found that her hymen was not intact and that her vagina had been stretched to a size that would have been "very unusual" even for an adult woman who had not had sexual intercourse. The doctor concluded that K. clearly had been sexually penetrated on prior occasions but he of course could not say who had done it.

Both defendant and the father were charged with sex offenses, defendant in Cottonwood County and Mark in both Cottonwood County and Hennepin County. Mark pleaded guilty to the Cottonwood County charges, admitting that he began having sexual intercourse with K. in the fall of 1985 (i.e., after K. had written the notes to her girl friends and after she had moved from Marshall).

Defendant's trial attorney, Herbert Kroon, filed a pre-trial motion on August 13, 1986, 6 days before trial commenced, asking the trial court to do a number of things, including: "3. Suppressing any and all testimony by or from Mark Axford regarding allegations of sexual contact between [him and K.]" and "4. Prohibiting the state from eliciting testimony from any other witness regarding allegations of criminal sexual abuse between Mark Axford and [K.]." On August 19, shortly before voir dire commenced, the attorney and the trial court discussed the motion. A record apparently was not made of the discussion, but one can infer from the record that the trial court indicated that he would let K. testify about Mark's abusing her and that he would defer ruling on whether the state could call Mark and question him about his abuse of K.

Defendant did not provide the court of appeals with a copy of the transcript of voir dire, but the state has provided us with a copy in connection with its appeal of the court of appeals' decision. During voir dire defendant's attorney asked most of the potential jurors about the possible effect of testimony that K.'s father had sexually abused her. Indeed, with at least six of the jurors he discussed the potential impact of testimony that Mark had admitted his guilt.

On the 20th, after most of the voir dire was completed, defendant's attorney, Kroon, brought up the matter on the record, stating that he "gathered it was the court's decision to withhold the ruling on calling * * * Mark Axford to testify pending the testimony the other witnesses give." Kroon then said he wanted to renew his motion relating to "any references to Mark Axford's conduct as it relates to [K.] because I believe they are extrinsic, therefore, not relevant and prejudicial." The trial court at first replied in substance that its feeling was that it might be prejudicial to allow the state to call Mark Axford but that the court might allow it if the defense by cross-examination or otherwise argued that any penetration that occurred was by Mark, not by defendant. Kroon

then asked if it would open the door to "testimony from Mark Axford" if he cross-examined the doctor about whether he could tell which individual or number of individuals had had penetration. The trial judge said that he did not know, that it depended on what kind of cross-examination took place, including cross-examination of the victim. The prosecutor, Bruce Gross, then argued that "any cross-examination attacking the credibility at times, the places, any issues along those lines of the victim I think would raise the issue of allowing the state to call Mark Axford to corroborate it." The trial court said, "It may." The court then elaborated, pointing out that Kroon had gone into the possible prejudice of the information in his *voir dire* of jurors and that "the probabilities appear as I see how the case is going to develop as counsel has told me that in all probability the state would be able to use this evidence, although there can be conditions where it could not."

Kroon then stated that he understood what he referred to as the trial court's "prior ruling" letting K. talk about all this and he made it clear that he understood the court's position regarding Mark Axford's testimony. He proceeded to argue against the admission of any testimony of other witnesses—presumably Debra Johnson—to the effect that K. had also implicated the father in the sexual abuse. The trial court said that it would have to "hear how it comes out," that if an attack on K.'s credibility was such, then the state could show that her statements had been consistent in this regard.

The trial started the next day, August 21. The defendant did not provide the court of appeals with a copy of the opening statements but the state has provided us with a copy in connection with its appeal of the court of appeals' decision. The prosecutor merely informed the jurors that they would hear about sexual abuse of K. by both defendant and by her father, that defendant's abuse occurred first and the father's abuse occurred later. Defense counsel in his opening statement attacked K.'s credibility, saying that the state's case would rise and fall on her testimony, that

even her friends felt that she was "mixed up and confused," that she had had psychological and emotional problems, that she had made allegations of abuse against other individuals, including her father, her mother and her maternal grandmother.

K. was the first witness. Consistent with our understanding of the trial court's ruling and with defense counsel's expressed understanding, she was asked late in her direct examination if anyone else had ever sexually abused her. K. said yes and, when asked who, said her father. She testified that the abuse included fondling, oral sex and sexual intercourse. Asked when it happened, she said that her father started doing it after defendant had started.

On cross-examination defense counsel tried to impeach K.'s credibility with inconsistent statements on various details and tried to do it by getting her to admit that she "may have" fabricated an earlier accusation she made to the authorities that her mother had been hitting her. She also testified on cross-examination that defendant and her father never committed any of the sexual acts in each other's presence and that as far as she knew her father did not know anything about what defendant was doing.

After K. left the stand, defense counsel asked the trial court if it was ready to decide the issue discussed in chambers about the calling of K.'s father. After some discussion the trial court ruled that the prosecutor could question the father about his abuse of K. because defense counsel's cross-examination of K. had compromised K.'s credibility.

The father was ordered to testify under a grant of immunity. He appears to have done his best to help defendant in his testimony. He testified that, contrary to what K. testified, K. was hardly ever alone with defendant on the visits to Windom and he testified that when he first started having sexual intercourse with K. in the fall of 1985 the physical act of penetration was very difficult to accomplish. He admitted, however, that he did not notice any bleed-

ing. As the medical testimony indicated, bleeding might have happened if K. had been a virgin at the time.

Three of K.'s friends from Marshall testified about the notes that K. wrote to them in the spring of 1985 about defendant's conduct. Debra Johnson testified about K.'s statements to her in January of 1986. The Windom police officer who interviewed K. testified in some detail about K.'s allegations against defendant.

Defendant in his testimony denied the charges. He also called a number of relatives and friends who, like him, said that K. was hardly ever alone with him and was not alone with him on the specific occasions she alleged. Other people testified to defendant's honesty. One of them was his minister, who also testified that they kept weekly church attendance records and that defendant had a very good attendance record. Defendant testified as to his physical inabilities, including partial impotence, testimony which was corroborated by his wife. Defendant's doctor testified that sexual dysfunction or impotence was a possible side effect of some of the medication defendant was taking for his ulcer and his bad back but that there was nothing on defendant's chart to show that defendant had complained of impotence.

On rebuttal, K.'s 9–year-old brother partially corroborated testimony of K. that defendant had once taken her to a barn on defendant's brother's farm and had sexual intercourse with her in the hayloft. Defendant claimed she fabricated the whole incident but K.'s brother testified that, while he waited below in the barn, defendant took K. up to the hayloft alone with him and was up there with her for 10 to 15 minutes.

Defendant did not provide the court of appeals with a copy of the transcript of the closing arguments, but the state has provided us with a copy in connection with its appeal. That transcript shows that the prosecutor did not use the evidence in question for an improper purpose and that defense counsel continued his strategy of attacking the victim's credibility.

The jury acquitted defendant of two charges relating to specific acts of abuse but found him guilty of the two charges alleging a course of sexual penetration occurring over an extended period of time. The trial court sentenced defendant to concurrent 50–month terms.

The court of appeals, in its opinion granting defendant a new trial, stated (a) that the prosecutor failed to give adequate pretrial notice of his intent to present the evidence, (b) that the prosecutor violated the trial court's order, (c) that the admission of the evidence was erroneous, and (d) that the error was prejudicial. *State v. Axford*, 409 N.W.2d 893, 895–96 (Minn.App. 1987).

(a) The adequacy of pre-trial notice is a nonissue. The defense moved 6 days before jury selection started to exclude the evidence in question, so obviously the defense either had adequate notice or was not prejudiced by the lack of notice.

(b) The court of appeals concluded that the state's elicitation of the evidence on direct examination of K. that the father had abused her was a violation of the trial court's rulings. As our fairly detailed recitation of the facts makes clear, this conclusion is wrong and appears to be based on a misunderstanding of the trial court's rulings. The trial court made it clear to the attorneys before any witnesses were called that the state would be able to elicit the testimony from K. on direct examination. The trial court conditioned the father's testimony on defendant's first attacking K.'s credibility in some way. That attack occurred during defense counsel's opening statement and during his cross-examination of K. It was then that the trial court expressly allowed the prosecutor to call the father and question him about his abuse of K. Thus, this is not a case of the prosecutor violating a court order, as the court of appeals' opinion put it, or of the trial court failing to enforce its own order, as the concurring opinion put it. 409 N.W.2d at 897.

(c) In analyzing whether the trial court erred in admitting the evidence, we start with Minn.R.Evid. 404(b). This rule pro-

vides that evidence of "other crimes"—not necessarily other crimes of the defendant on trial—"is not admissible to prove the character of a person in order to show that he acted in conformity therewith" but may be admitted, in the discretion of the trial court, for other purposes that do not involve the forbidden inference of propensity, some of which are specifically listed in the rule. In other words, the rule—like R. 404(a), which generally excludes character evidence—does not even apply when the other-crime evidence is used for some purpose other than to show that the person acted in conformity with his character. *State v. Filippi,* 335 N.W.2d 739, 743 (Minn.1983). Professor Wright, whose analysis of R. 404(b) is helpful, takes the position that the R. 404(b) exclusionary rule clearly prohibits the proof of other crimes of a party other than the defendant if the evidence is offered to prove *the other party's character* as a basis for an inference as to *that party's conduct;* and he argues that, although the rule is not clear in this point, the exclusionary sanction should also apply if the conduct of a third person is offered to prove *the accused's character* as a basis for an inference as to *the accused's conduct.* 22 C. Wright & K. Graham, *Federal Practice and Procedure—Evidence* § 5239, at 457–58 (1978). He also states, however, that proof of conduct of third persons does not normally support a strong inference as to the character of the defendant himself and therefore normally ought not be excluded pursuant to the R. 404(b) exclusionary rule. *Id.* at 451.

In this case the exclusion sanction of the rule does not apply because the evidence of K.'s father's misconduct clearly was not offered for the purpose of proving anyone's character as a basis for an inference as to the defendant's conduct. The appropriate analysis in this case is the basic R. 403 analysis—did the trial court, after balancing the relevance of the evidence against the potential of the evidence for unfair prejudice,[1] properly exercise its discretion in admitting the evidence?

The evidence was relevant in a number of ways. For one thing, this is an incest case involving a young girl who delayed reporting the offense for a considerable period of time. The trial court's ruling allowed the jury to hear evidence which tended to counter any inclination among the jurors to wrongly discredit the victim's testimony because of the delay in complaining about defendant's conduct. In *State v. Myers,* 359 N.W.2d 604, 609–10 (Minn. 1984), we attempted to explain why children in incestuous families often delay reporting the incest and why jurors may be helped by expert testimony. In this case—and this must have been clear to the trial court from the outset—the defense strategy was to do everything possible to attack K.'s credibility and to bolster defendant's credibility. Indeed, as the trial progressed it became clear that most of the family had rallied to defendant's side and that they were doing their best to make K. look like a liar and to show that defendant was a man of sterling character. Even defendant's minister testified as to defendant's good character. Given all this, it would have been easy for the jurors, unaware of how young victims of incest behave, to conclude that K. would have reported defendant's conduct earlier if she was telling the truth. The admission of the evidence that the father was sexually abusing the victim (along with the evidence that K. had a bad relationship with the mother and the evidence that defendant had threatened the victim) gave the jurors a more complete and more believable explanation of why K. acted as she did.

The evidence was also relevant in that it allowed the state to give the jurors a picture of what the defendant did in the true context in which he did it. If there had been a conspiracy between the father and defendant to sexually abuse defendant, then obviously any acts committed by the

---

1. In *State v. Cermak,* 365 N.W.2d 243, 247 at n. 2 (Minn.1985), we agreed with Professor Wright that the unfair prejudice spoken of in R. 403 "does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence" but "refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." 22 C. Wright & K. Graham, *Federal Practice and Procedure—Evidence* § 5215 at 274–75 (1978).

father as part of the conspiracy would be admissible against the defendant at the defendant's trial. *Cermak*, 365 N.W.2d at 246–47. K. testified that as far as she knew her father did not know about defendant's conduct, and she presumably would have said, if asked, that defendant did not know about her father's conduct. Of course, we do not know that there was not some sort of conspiracy—at least a conspiracy to look the other way—and it is certainly possible that there was a conspiracy. In any event, assuming that there was not a conspiracy, that does not mean that the evidence was not admissible. The father's conduct overlapped with and was identical with the conduct which K. attributed to defendant. Further, whether intentionally or not, the father facilitated defendant's abuse of K. by frequently bringing K. with him to defendant's place. Also, the overlapping acts were sufficiently connected in the victim's mind that she reported them to Debra Johnson on the very same day.

The evidence was also relevant in that it corroborated K.'s initial statement to Debra Johnson as well as K.'s trial testimony. Absent some rule of exclusion or some tendency of the evidence to produce an overbalancing amount of unfair prejudice, corroborating evidence is admissible. Here the fact that defendant's father admitted in court having sexually abused K. showed that, at least as to his conduct, she was not lying. Further, his testimony that no bleeding occurred when he first had sexual intercourse with her in the fall of 1985 provided limited corroboration of her testimony about defendant, because in combination with the medical evidence it tended to show that her hymen was not then intact. This in turn tended to show that, as she claimed, she had been having sexual intercourse with someone else prior to that date. Also, the evidence fit with the evidence that K.'s notes to her friends in the spring of 1985 did not mention the father whereas her complaint in January of 1986 did mention him.

Given the obvious strategy of the defense—to attack K.'s credibility in every way possible, to call as many family members as possible to say in effect that she was a liar, and to portray defendant as a person of high moral character—the need for the evidence was great. Without denying that the evidence carried with it some potential for persuading the jury by illegitimate means, we believe that that risk was far outweighed by the relevance of and the need for the evidence. Under the circumstances, the trial court did not abuse its discretion in admitting the evidence.

(d) Our conclusion that the trial court did not err in admitting the evidence arguably obviates the need for addressing the court of appeals' conclusion that any error in admitting the evidence was prejudicial. However, in the interest of avoiding future error we reiterate what we said in *State v. McMorris*, 373 N.W.2d 593, 595–96 (Minn. 1985), another case in which we reversed the court of appeals and reinstated a judgment of conviction:

> The Court of Appeals did not address the issue of whether defendant was prejudiced by the trial court's handling of the matter. If it had done so, it would have had to conclude on this record that defendant was not prejudiced. As we have said, "Normally, a criminal defendant cannot obtain a new trial on appeal by establishing that error occurred in the conduct of the trial unless he provides this court with a complete transcript or an appropriate stipulation concerning what would be disclosed by a complete transcript" because "[w]ithout such a transcript or stipulation, we cannot verify whether the error resulted in prejudice." *State v. Anderson*, 351 N.W.2d 1, 2 (Minn.1984) (refusing to decide whether trial court erred in response it gave to juror's questions concerning the law because the defendant on appeal did not provide a complete transcript); *see also*, to the same effect, *State v. Engler*, 319 N.W.2d 705 (Minn.1982). Defendants (sic) supplied the Court of Appeals with only a partial transcript, and the transcript does not in any way support the view that defendant was prejudiced by the trial court's handling of the matter. Indeed, as we earlier stated, the inferences

one can reasonably draw from the complaint and the prosecutor's closing argument are to the contrary.

In this case defendant provided the court of appeals with an incomplete transcript. The transcript provided did not contain *voir dire*, the opening statements, the closing arguments, or the instructions. Transcripts on appeal in criminal cases usually contain everything except the *voir dire*. In this case even the transcript of the *voir dire* was relevant to the appeal. The court of appeals' opinion concluded that the error was prejudicial but the opinion did not go through any harmless error analysis of the evidence. We do not address the hypothetical question of whether any error in admitting the evidence would have been prejudicial. However, we can say that even if the partial transcript provided the court of appeals had supported a conclusion that prejudicial error occurred, the court of appeals should not have reversed because it was always possible that the parts not provided would show that any error was invited (as by defense counsel "opening the door") or cured (as by a plea by the prosecutor in closing argument that the jurors not use the evidence for an improper purpose or as by a curative or limiting instruction by the trial court).

In summary, given our conclusion that the trial court did not err in admitting the evidence, we reverse the decision of the court of appeals granting defendant a new trial and remand the case to the court of appeals for consideration of issues left undecided by its decision.

Reversed and remanded to court of appeals.

POPOVICH, J., took no part in the consideration or decision of this case.