**STATE of Minnesota, Respondent,**

v.

**Randy Don LANDIN, Appellant.**

**No. C2–90–1829.**

Supreme Court of Minnesota.

Aug. 2, 1991.

John M. Stuart, State Public Defender, Elizabeth B. Davies, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

WAHL, Justice.

Randy Don Landin was convicted of first degree premeditated murder, Minn.Stat. § 609.185(1) (1990), for the shooting death of Kathleen Nesser and sentenced to life imprisonment. On appeal, Landin seeks reversal of his conviction, claiming there was insufficient evidence to support his murder conviction. In the alternative, he seeks a new trial, arguing that the trial court committed reversible error by admitting evidence of his 1979 second degree murder conviction in connection with the death of a former girlfriend and two additional *Spreigl* incidents. Landin also argues he should be given credit for all time spent in pre-trial detention and personally asserts that he was denied a fair trial by various rulings of the trial court. We affirm the conviction and remand for modification of sentence to reflect time served during pre-trial detention.

Kathleen Nesser was killed by a single shotgun blast to the chest at close range outside her New Hope townhouse near her car at approximately 3:30 a.m. on July 19, 1988. There were no eyewitnesses to the shooting nor did any of the nearby residents who had been awakened by the shot hear anything else unusual. There was no evidence of either robbery or sexual assault.

Although the police did not find any incriminating evidence at the scene—such as

weapons, expended shotgun shells, fingerprints, footprints or fiber samples—defendant was the prime suspect in the homicide based upon death threats he had made towards Nesser prior to the shooting. The police immediately obtained a search warrant for the home of defendant's parents with whom defendant lived in Crystal. The police executed the warrant that afternoon and seized several items from defendant's room in the basement, including a 12–gauge shotgun cleaning kit with two wet cleaning patches and several "M–80" firecrackers. Although defendant's father recalled having a disassembled 12–gauge shotgun in the basement, when he went to look, the gun was no longer there. Defendant's red Chevrolet pickup was discovered later that afternoon by Plymouth police in a parking lot several blocks from Nesser's townhouse. After the pickup was towed to the New Hope police department, it was searched under warrant and several more M–80 firecrackers were seized. The New Hope police then distributed a picture of defendant to other police departments as well as to the media in hopes of finding him. Three days later defendant turned himself in at the New Hope police station, saying "I hear you are looking for me." He had with him a knapsack with a lot of toilet articles and most of his valuables. He was immediately arrested.

According to trial testimony, Nesser and defendant had worked on the same custodial crew at the Honeywell plant in St. Louis Park for 6–8 months until a week before her death on July 19, 1988, when Nesser transferred to Honeywell's Plymouth facility where she worked part-time in the cafeteria. Nesser, who had an 18–month–old daughter, lived in New Hope, Minnesota, sharing a townhouse with fellow employee Diane Johnson, who also had a child.

One of Nesser's co-workers testified that defendant often gave Nesser rides on his motorcycle and that they regularly took breaks together at work. Johnson testified that even though defendant had been over to see Nesser many times—and had spent the night at least once—the two were just friends and not dating.

On Memorial Day weekend, six weeks before her death, Nesser went with defendant on his motorcycle to a party at the lake cabin of the uncle of his friend Michael House but only Michael was there. Defendant and Nesser stayed up all night talking, drinking beer, fishing and using speed. Following that weekend, defendant and Nesser began to disagree on the status of their relationship. According to some of Nesser's friends, Nesser wished to remain "just friends" with defendant, while defendant wanted or expected something more serious. From there, the relationship deteriorated to the point that Johnson overheard Nesser tell defendant she wanted nothing more to do with him and that he should just leave her alone.

At this point, defendant began to threaten and harass Nesser. She told friends about several threats she had received from defendant, for example, Nesser would "get what's coming to her;" if defendant "couldn't have [Nesser] nobody else will;" and that defendant "had already killed someone and [he] could get away with it again." Later in June, several of the residents in Nesser's townhouse complex noticed firecrackers going off near Nesser's townhouse, although no one saw who set them off. On June 30, Nesser told her supervisor at Honeywell, Dode Hurkman, that she no longer wanted to see defendant and as a result he was becoming "mean and abusive." Nesser described to Hurkman an incident where defendant had recently dented a metal door at work with his fists. Later that day, Nesser told Hurkman that defendant had kicked her locker thereby bending the door in.

On July 1, Honeywell security notified the St. Louis Park police that Nesser had found "one more day, dead" written on her locker door. Although a handwriting expert could not positively identify it as defendant's handwriting, she noted there were "a lot of similarities" between the writing on the locker and a handwriting sample taken from defendant. In addition to the threat on the locker door, Nesser listed several previous threats she had received from defendant, including: "I wasted a thousand dollars on you"; "you're in

trouble girl"; and "you're dead"; "you're still dead."

On July 11, 1988, Nesser called New Hope police and reported more harassing phone calls. New Hope police checked with St. Louis Park police. Defendant admitted to his friend Michael House he was upset with Nesser, was making prank calls, had written on her locker and had also kicked the door in on her locker. Nesser called New Hope police on July 15, 1988 and told them of calls she believed were from Randy Landin and of the two firecracker incidents.

On the evening of July 18, 1988, Nesser worked from 6–9 p.m., went to a bar with her friend Joe Graf until the bar closed at 1:00, then played cribbage and drank tequila at Graf's apartment until 2:20 or 2:30 a.m. when she left for her own apartment which was 15 minutes away. Around 3:25 a.m. Johnson and several other residents of the townhouse heard a loud bang, one heard screams. Police, called at 3:29 a.m., came immediately and found Nesser dead in front of her garage with a shotgun wound in her chest.

While no one saw defendant at Nesser's townhouse on the morning she was shot, a resident of the apartment complex where defendant's pickup was recovered testified that while she was taking out the garbage the night before, she got a brief glimpse of defendant walking in the parking lot between 11:00 p.m. and 12:00 midnight. Another resident, who was walking her dog at the same time, saw a bearded man (at the time of the murder, defendant had a beard) walking in the parking lot. This resident also testified she had observed a man sitting in a pickup like defendant's in the apartment parking lot on several occasions during the week prior to the murder. She could not, however, identify defendant as being either the person she saw walking in the parking lot or as the person sitting in the pickup. A third resident testified he saw a man who looked like defendant taking what appeared to be a gun wrapped in

either a jacket or a blanket out of defendant's pickup on the night of July 18. On cross-examination, however, he conceded that he may have told a public defense investigator prior to the trial that the man he saw in the parking lot "definitely did not have a beard."

Howard Bergstrom, who had met defendant in prison while defendant was serving his sentence for the murder of Nancy Miller, testified that approximately one week before Nesser was murdered, defendant gave him $150 with which to buy a large caliber handgun for defendant. Instead of buying a handgun, Bergstrom, who was a cocaine addict at the time, spent the money on drugs. Four or five days later, defendant returned with a 12–gauge shotgun that he wanted Bergstrom to "saw off." [1] When Bergstrom asked defendant why he needed the shotgun, defendant said he was going to kill someone at work.

The trial court admitted *Spreigl* evidence of three prior incidents involving the defendant. The first incident concerned defendant's guilty plea to second degree murder for strangling his girlfriend, Nancy Miller, in 1979. Defendant and Miller had worked together at Honeywell before becoming romantically involved. Although defendant moved into Miller's Minneapolis apartment in June 1979, she continued to see her former boyfriend, John Holasek, from time to time. According to Holasek, defendant was upset with this arrangement and threatened Miller on several occasions in July 1979.

Later in July, Miller decided to break up with defendant. After she asked him to move out of her apartment, defendant agreed to leave in September. Miller spent the next several nights with Holasek, but on the night of August 2 defendant asked Miller to stay with him and she agreed. The next morning, Holasek went to Miller's apartment and rang the buzzer. No one answered. Inside, Miller told defendant she wanted to leave with Holasek. Defendant then became upset and strangled Mil-

---

1. Bergstrom testified he had sawed off shotguns and sold them on at least two prior occasions. On this occasion, however, Bergstrom testified

he traded the shotgun given him by defendant for drugs.

ler with a rope. Defendant turned himself in to the police several days later and eventually pleaded guilty to second degree murder.

The second *Spreigl* incident involved another former girlfriend of defendant, Gretchen Leaf, who went out with defendant two or three times in 1986 following defendant's release from prison. After defendant confided that he had killed his last girlfriend (Nancy Miller), Leaf became scared and stopped seeing defendant. Following the breakup, defendant sat outside Leaf's apartment in his pickup for at least two weeks and followed her whenever she left her apartment. According to Leaf, defendant shot out a street light outside her apartment with a pellet gun. In an effort to avoid defendant's harassment, Leaf spent a week at her father's house. When she returned, her apartment had been broken into and ransacked. While charges were never brought against defendant, according to Bergstrom, defendant admitted he "tore her apartment up" because he was upset.

The third *Spreigl* incident concerned the burglary of the home of Kim Barritt, a high school friend of defendant. Barritt testified his home was broken into over the July 4, 1988, weekend while he and his family were away. Although there were several TV sets in the house, along with a VCR and some money, the only item stolen was a 12–gauge Winchester pump action shotgun with a broken pump action. Defendant was tied to the burglary by Howard Bergstrom, who testified the shotgun defendant had brought him to be sawed off was a 12–gauge Winchester shotgun with a broken pump action. He also testified defendant claimed to have stolen the shotgun from an old friend.

The jury found defendant guilty of first degree premeditated murder. Defendant has never admitted and continues to deny that he killed Nesser. He appeals his conviction.

■ 1. Defendant claims the evidence presented at trial was insufficient as a matter of law to sustain his conviction for first degree murder because the state failed to prove beyond a reasonable doubt that he was the perpetrator of the offense.

The relevant statute provides that one is guilty of first degree premeditated murder if that person "causes the death of a human being with premeditation and with intent to effect the death of the person * * *." Minn.Stat. § 609.185(1) (1990). Where, as here, a conviction is based on circumstantial evidence, the appropriate standard of review is whether "the circumstances form 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.'" *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988) (quoting *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980)). As with other cases, the jury remains free to determine the credibility and weight to be given to witness testimony. *Id.*

Defendant argues the evidence was insufficient to convict him because the reasonable inferences to be drawn are consistent with his innocence. Defendant points to the lack of evidence identifying him as the perpetrator, i.e., no eyewitnesses, fingerprints, footprints, fiber samples or shell casings. A lack of incriminating physical evidence does not, however, necessarily undermine a guilty verdict. *Id.* at 485–86.

In *Bias*, the defendant was convicted of killing an acquaintance while stealing a submachine gun, then setting a fire to destroy any evidence. *Id.* at 481. This court held that any evidentiary gaps did not support defendant's claim of innocence "given the implausibility of an alternative offender who somehow gained access to the apartment after 10:30 p.m.; murdered [the victim] and started the fire; stole the gun but ignored other valuable items in plain sight; and escaped notice * * *." *Id.* at 486. Here, defendant's innocence requires a similarly implausible inference that another offender waited outside Nesser's townhouse, murdered Nesser, yet left her purse and did not sexually assault her.

Defendant advances, as a rational hypothesis, that Nesser was murdered by "Robert", who at one time had been in-

volved in an abusive relationship with Nesser. There was testimony, however, that Nesser had not seen Robert in over two years and that he had not contacted her prior to her death.

Witnesses for the state also testified that after Nesser told defendant she no longer wanted to continue seeing him, defendant started threatening her; that the writing on Nesser's locker—"one more day, dead"—was consistent with defendant's writing; that Nesser told St. Louis Park Police Officer Fraser of specific threats, told co-worker Tony Showalter that defendant said, "You're dead meat," told former boyfriend Dean Storgaard defendant had said, "He had already killed someone and he could get away with it again," told Joe Graf defendant left a note in her car window, "If I can't have you, no one else will"; and that defendant told Michael House he'd scratched out Nesser's name on her locker and put "dead".

The state produced further evidence: Defendant's truck was parked not far from Nesser's townhouse the night of the murder and had been seen parked there "lots of times" in the weeks before the murder. M–80 firecrackers, like the M–80's set off around Nesser's townhouse, were found in defendant's room and in his truck. A man identified as defendant was seen stalking in a nearby apartment area parking lot between 11:00 p.m. and 12:00 p.m. the night of the murder. Defendant's father told police a disassembled 12–gauge shotgun in his house was missing. A 12–gauge shotgun cleaning kit was found in defendant's room, the cleaning pads wet with solvent. Nesser was killed with a 12–gauge shotgun. Defendant turned himself in to the police with a knapsack packed with "the type of items that had value in prison." There was corroborative *Spreigl* evidence of defendant's violence toward women who rejected him.

Assuming, as we must, that the jury believed the state's witnesses, the jury could draw no reasonable inference other than defendant's guilt from the evidence before it. We hold the evidence was suffi-

cient to sustain defendant's conviction for first degree premeditated murder.

2. Defendant next argues the trial court committed reversible error by admitting evidence of defendant's prior conviction for second degree murder of a former girl-friend and two additional *Spreigl* incidents.

■■■ Evidence of other crimes or acts is inadmissible to prove a defendant's propensity to commit the charged offense, *State v. Thieman,* 439 N.W.2d 1, 6 (Minn. 1989), but such evidence may be admitted " 'to establish motive, intent, absence of mistake or accident, identity or common scheme or plan.' " *State v. DeWald,* 464 N.W.2d 500, 502–03 (Minn.1991). Because admission of *Spreigl* evidence rests within the sound discretion of the trial court, a trial court's ruling will not be disturbed absent a clear abuse of discretion. *Id.* at 503. Where the admissibility of *Spreigl* evidence is unclear, however, the defendant is to be given the benefit of the doubt and the evidence rejected. *Id.*

■■■ To admit *Spreigl* evidence, the trial court must find that (1) the evidence is clear and convincing that the defendant participated in the *Spreigl* incident; (2) the *Spreigl* evidence is relevant and material to the state's case; and (3) the probative value of the *Spreigl* evidence outweighs its potential for unfair prejudice. *Id.* On appeal, the defendant has the burden of proving both that the trial court erred in admitting evidence of other crimes, and that the admitted evidence prejudiced the defendant. *State v. Slowinski,* 450 N.W.2d 107, 113 n. 1 (Minn.1990).

■■■ As to each of the *Spreigl* incidents, the defendant has failed to prove the trial court erred by admitting the *Spreigl* evidence. With respect to the murder of Nancy Miller, there is clear and convincing evidence of defendant's involvement based on his guilty plea. *See id.* at 114. The "relevant and material" requirement is satisfied as well. Where, as here, *Spreigl* evidence is offered to establish identity, the *Spreigl* offense must be similar to the charged offense either in time, location or modus operandi. *DeWald,* 464 N.W.2d at

503. The relevancy of Miller's murder is based on several similarities between that incident and Nesser's murder: both incidents took place in the Twin Cities, each woman had been a co-worker with defendant at Honeywell later becoming involved in some type of relationship with the defendant, each was threatened and harassed by the defendant after trying to break off the relationship, and a short time after each murder, defendant turned himself into the police.

While defendant contends the two murders are dissimilar because, among other things, Miller was strangled while Nesser was shot, such distinctions are unpersuasive given that absolute similarity between the charged offense and the *Spreigl* offense is not required to establish relevancy. *See State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). In addition, the nine-year gap between Miller's murder and Nesser's murder does not bar use of that evidence because defendant was in prison for the murder until 1984, and therefore incapacitated. *See State v. Norris*, 428 N.W.2d 61, 70 (Minn.1988).

■ Lastly, though the potential for prejudice of the evidence of the Miller murder was great, its probative value outweighed any unfairly prejudicial effect. When balancing the probative value of *Spreigl* evidence against the potential for unfair prejudice, the trial court must consider how crucial the *Spreigl* evidence is to the state's case. *DeWald*, 464 N.W.2d at 504. The trial court is to admit the evidence only if other evidence of defendant's identity is weak or inadequate and the *Spreigl* evidence is needed as support for the state's burden of proof. *Id.* In this case, evidence of identity was weak due to the absence of eyewitnesses and the lack of physical evidence at the scene incriminating defendant. The evidence of Miller's

murder was crucial to the state's case because absent this evidence the state had only the defendant's threats against Nesser to tie him to her murder.[2] As in *DeWald*, evidence of a prior murder conviction was necessary to establish identity and modus operandi.

■ Evidence of the harassment of Gretchen Leaf was also properly admitted. There was clear and convincing evidence of defendant's involvement based on Leaf's testimony, corroborated not only by the police seizure of a pellet gun from defendant's bedroom matching the description Leaf gave police of the pellet gun she saw defendant use to shoot out the street light outside her apartment, but by defendant's admission to Bergstrom that he "tore up" Leaf's apartment.

The relevancy of this evidence is based on several similarities between the harassment of Leaf and the murder of Nesser: both incidents took place in the Twin Cities, each woman had been involved in a relationship with the defendant, and each was threatened and harassed by the defendant after trying to break off the relationship. In addition, the three-year gap between the harassment of Leaf and Nesser's murder is within the time frame of prior decisions of this court. *See, e.g., Slowinski*, 450 N.W.2d at 114 (*Spreigl* incidents occurred three years before murder). Finally, the probative value of the evidence outweighs any potential for unfair prejudice because, as with the Miller homicide, this evidence was crucial to the state's case as a means to establish identity.

■ Evidence of the burglary of Kim Barritt's home was also admissible. Clear and convincing evidence of defendant's involvement in the incident was established by defendant's admission to Bergstrom that he had burglarized a friend's home and taken a shotgun, and by the description Bergstrom gave of the shotgun defen-

2. Although the state introduced testimony from the resident of the apartment complex where defendant's pickup was found that she saw defendant in her apartment parking lot at between 11:00 p.m. and midnight on July 18, since Nesser was murdered at 3:25 a.m. several blocks away, that testimony does not place defendant at the murder scene. Moreover, that resident, by her own admission, got only a brief glimpse of the person walking in her parking lot under less than ideal lighting conditions. *See State v. Walker*, 310 N.W.2d 89, 90 (Minn.1981) (when a single witness' identification of a defendant is made after only fleeting or limited observation, corroboration is required if the conviction is to be sustained).

dant brought to be sawed-off—a Winchester 12 gauge shotgun with a broken pump action—which matched the description of the shotgun taken. While defendant attacks Bergstrom's credibility, the weight and credibility given to the testimony of a witness is within the province of the jury, *State v. Rainer*, 411 N.W.2d 490, 495 (Minn.1987), therefore the jury was free to believe Bergstrom's testimony.

With respect to relevancy, the burglary of Barritt's home was offered as evidence of plan, preparation or intent. Such evidence is admissible if the prior offense is related in scheme, pattern and time to the charged offense. *See State v. Dinneen*, 300 Minn. 354, 358, 220 N.W.2d 292, 295 (1974). Nesser was killed with a large gauge shotgun. An attempt by the defendant to obtain a 12 gauge shotgun illegally only 15 days before the murder clearly fits within the scheme, pattern and time of Nesser's murder. Defendant's arguments that evidence of the burglary was more prejudicial than probative are without merit.

We hold the trial court properly admitted evidence of defendant's prior conviction for second degree murder and two additional *Spreigl* incidents.

3. Defendant requests that this court order the trial court to modify his sentence to reflect the time he spent in pretrial detention. The state does not oppose that motion. Defendant is entitled to the time he spent in pre-trial detention. Since it does not appear from the record that defendant was given credit for that time, we order that his sentence be modified accordingly. *State v. Arden*, 424 N.W.2d 293, 294 (Minn.1988).

4. In a pro se brief, defendant raises numerous allegations of error by the trial court which he claims denied him a fair trial. These general allegations of unfairness lack factual support in the record and are without merit.

Affirmed and remanded for modification of sentence.