STATE of Minnesota, Respondent,

v.

Steve Paul BERRY, Appellant.

No. CX–91–762.

Supreme Court of Minnesota.

May 1, 1992.

John M. Stuart, State Public Defender, Susan Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, and Richard T. Jessen, Benton County Atty., Foley, for respondent.

KEITH, Chief Justice.

Steve Paul Berry was found guilty by a jury in Benton County District Court of participating in the first degree premeditated murder of Cindi Ann Schram. On appeal, Berry seeks reversal of his conviction, claiming there is insufficient evidence to support the verdict. In the alternative, he seeks a new trial, arguing: (1) that the trial court committed reversible error by admitting evidence of three *Spreigl* incidents involving appellant where the potential for unfair prejudice outweighed the probative value, and (2) by refusing to suppress a statement made by appellant to Coleman Salvog in which appellant implied that he had murdered someone previously. We affirm the conviction.

On the morning of April 26, 1990, Cindi Ann Schram was found dead in a ditch on County Road # 57 in Sauk Rapids Township in Benton County. The cause of death was exsanguination as a result of gunshot wounds caused by a .32 caliber gun. The time of death was placed between 1:30 and 3:30 in the morning of April 26. Schram had been killed by Kevin Wilcox, who pleaded guilty to first degree premeditated murder and refused to testify at Berry's trial.

Berry was charged under Minnesota Statute section 609.05, which states in relevant part:

A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

Minn.Stat. § 609.05, subd. 1 (1990).

Berry and his girlfriend, Marilyn Davis, lived in a rented house in St. Cloud, Minnesota. Several of their friends including Schram, Wilcox and Davis' brother, Wayne Gilroy, lived with them on and off. Berry and his friends made their living selling drugs, fencing stolen property, stealing blank checks from unlocked cars and passing stolen checks. There were two guns in the house, the murder weapon, a .32 caliber hand gun which belonged to Davis' father, Leroy Gilroy, but which Berry carried in a shoulder holster which he wore most of the time, and a .410 shotgun which belonged to Berry.

There was a good deal of evidence that Schram owed Berry $1200 for phone bills and for marijuana she had stolen from his basement. There was also evidence that Berry believed that Schram was a snitch. In the days and hours preceding her death, Berry told several people that he was going to "kill the bitch my way" because "she liked to run her mouth."

On April 25, 1990, Berry and Davis had a party in their house which began at dusk and ended at dawn on April 26. The day of the party, Berry testified he was in a great deal of pain because he had fallen and reinjured his broken leg. He used up all his pain medication, and then drank a great deal of liquor to alleviate the pain. Schram was at the house during the day, left during the afternoon, and returned to the party during the evening.

During the day and that evening, several witnesses testified that Berry indicated he wanted Schram dead. He specifically asked Dane Larson to kill Schram. At first, Larson thought he was joking. Berry asked him again several times before Larson realized he was serious. Larson testified that he had left Berry's house during the afternoon. When he returned to the party that evening, Berry told him that Schram had been telling people that he, Larson, was a "baby raper." Larson and Schram were alone in the back yard between 1:00 and 2:30 a.m. when Larson struck her; Berry and the other guests were in the front yard. After the other guests turned on Larson for hitting Schram, he left the party alone. His whereabouts after the party were corroborated by several disinterested witnesses. Larson testified that he felt he had been set up by Berry. Schram then asked Berry

for a ride home and Berry arranged for Wilcox to drive her home in Berry's car. Wilcox returned alone to the party about 30–45 minutes later.

At this point, the facts are disputed. Salvog, the key witness for the state, was given immunity. He testified that during the evening Berry tried to solicit him to kill Schram, but he declined. This was corroborated by Wayne Gilroy who was present. Both Gilroy and Salvog testified that Berry next asked Wilcox, who nodded his head. According to Salvog, after Wilcox returned to the party, he, Salvog, and Berry met in the garage. Berry asked Wilcox, "Is it done?" and Wilcox answered, "Yes, I think so." Berry asked again, "Are you sure?" and Wilcox replied, "I believe so." Wilcox handed the .32 gun to Berry and Berry pulled the clip out and checked the chamber which was empty. He then put four or six bullets in the clip and handed the gun to Salvog directing them both to return to the scene to make sure that Schram was dead.

Wilcox drove Salvog in Berry's car to where he had killed Schram and Wilcox used Salvog's knife to cut a lock of hair from her head. After they returned to Berry's garage, they gave Berry the lock of hair and the .32 gun. Berry tried to burn the hair, but it was too wet to burn. Salvog did not see what Berry did with it after that. Wilcox then described how he had killed Schram.

Salvog also testified that Berry told him that he, Berry, was pretty shook up the first time he had ever killed anybody.

Salvog further testified that when he was ready to go home, Berry handed him the gun with the barrel missing and told him to hide it. Salvog broke the gun down into its component parts which he hid in various spots in his house. A few days later, Berry called and told him to get rid of the gun, and Salvog threw the parts in the Mississippi River. The gun parts, except for the barrel, and bullets were later retrieved from the river by police divers. The gun barrel was never recovered. There was testimony from other witnesses that the day after the party, at Berry's

direction, the exterior of his car was washed and its interior cleaned.

Berry testified that although he had argued with Schram about the money she owed him, they had settled the payments. He admitted to making threats to kill her, but denied he solicited Wilcox to kill her. He admitted he was wearing the gun in the shoulder holster that day, but that he had taken it off and placed it on the dryer at the back entrance of the house. He did ask Wilcox to drive Schram home, and said he did not believe Wilcox when he said he had killed her. He testified he did not remember much about that evening, but that Wilcox and Salvog returned to the body. He denied trying to burn Schram's hair, but admitted to burning a towel which Schram had used to wipe the blood off her lips after Larson had hit her. Then, being afraid that the gun would be traced to him, he took the gun apart and placed the pieces in a bag which he gave to Wilcox, not to Salvog, to dispose. When he learned that Salvog had the gun, he told him to get rid of it.

## I

■ The trial court admitted *Spreigl* evidence of three prior incidents involving Berry. The first incident, related through Seivert Jarvi, occurred on March 18, 1982. Berry, someone named Schieber, and Jarvi went to the home of Richard Johnson because Berry wanted to beat Johnson up for snitching. Berry took something from the trunk of the car and he and Schieber went into the house. Jarvi testified that he heard things being broken inside the house and a loud bang or report which sounded like a gun-shot.

The second *Spreigl* incident involved threats made by Berry against Cheryl Krocak on April 25, 1990. Berry went over to Danny Judkins' apartment looking for Krocak. Krocak and Judkins have a daughter and Berry asked Judkins if he wanted to babysit the daughter for the rest of his life. Berry said he wanted to beat up Krocak and to kill her because she had snitched on him. Berry had also stopped at Krocak's apartment and her roommate corroborated

the threats. Two other witnesses also corroborated these threats.

The last incident occurred on or about March 15, 1990. Judkins testified that he was having a dispute with his girlfriend, Krocak, about their child, and had taken the child away. Judkins went to Berry's house where Krocak was staying. Berry grabbed him and pointed a gun at his head. He threatened that if Judkins returned without the child, he would "beat his ass." Judkins returned with the child fifteen minutes later.

Appellant argues that the trial court committed reversible error by admitting this evidence. Evidence of other crimes or acts is inadmissible to prove the character of a person in order to show that the person acted in conformity therewith, but such evidence may be admitted, in the discretion of the trial court, if the purpose is a legitimate purpose rather than a purpose involving the forbidden inference of propensity. *State v. Axford*, 417 N.W.2d 88, 91–92 (Minn.1987). Legitimate purposes include establishing motive, intent, absence of mistake, identity or common purpose or plan. *State v. Landin*, 472 N.W.2d 854, 859 (Minn.1991); *See* Minn.R.Evid. 404(b). Because admission of *Spreigl* evidence rests within the sound discretion of the trial court, a trial court's ruling will not be disturbed absent a clear abuse of discretion. *State v. DeWald*, 464 N.W.2d 500, 503 (Minn.1991).

To admit *Spreigl* evidence, the trial court must find: (1) clear and convincing evidence that the defendant participated in the *Spreigl* incident; (2) the *Spreigl* evidence is relevant and material to the state's case; and (3) the probative value of the *Spreigl* evidence outweighs its potential for unfair prejudice. *DeWald*, 464 N.W.2d at 503.

As to each of the *Spreigl* incidents, appellant has failed to prove the trial court erred in admitting the evidence. Appellant does not dispute that there was clear and convincing evidence of appellant's involvement in the three incidents. Rather, appellant contends that the three incidents were not sufficiently similar to the facts of the present case to aid the jury in determining whether he did in fact have a *modus operandi*. Absolute similarity between the charged offense and the *Spreigl* incident is not required to establish relevancy. *State v. Landin*, 472 N.W.2d 854, 860 (Minn. 1991). Each of the three incidents is relevant because of the similarity of the way appellant behaved when trying to maintain control of the people with whom he worked. If he thought someone had snitched on him, Berry resorted to threats and to acts of violence against that person.

Finally, when balancing the probative value of *Spreigl* evidence against the potential for unfair prejudice, the trial court must consider how necessary the *Spreigl* evidence is to the state's case. *Landin*, 472 N.W.2d at 860; (*citing DeWald*, 464 N.W.2d at 504). Only if the other evidence is weak or inadequate, and the *Spreigl* evidence is needed as support for the state's burden of proof, should the trial court admit the *Spreigl* evidence. *Landin*, 472 N.W.2d at 860. Here, the trial court determined that the state's evidence was weak as to Berry's intent and *modus operandi*. The *Spreigl* evidence was necessary to prove that Berry was not just blowing off steam, but in fact, carried out his threats. It filled in the picture of Berry as a man who was not well disposed to those who snitched on him, who threatened others verbally and physically, and who carried out his threats.

The first incident showed that Berry enlisted the help of two of his friends to threaten Johnson. In the second incident, Berry and his friends went to two places looking for Krocak. The fact she was not home when he made the threats does not lessen the probative value of the evidence regarding Berry's intent and *modus operandi*. Three people testified regarding these threats, and at least one felt the necessity to warn Krocak about Berry's threats. The third incident involving his aiming a gun at Judkins' head as he ordered him to return the child to Krocak resulted in Judkins immediately obeying Berry.

The probative value of the *Spreigl* evidence outweighed any potential for unfair prejudice. Not only was it probative of Berry's intent to have someone kill Schram, it was also probative of Berry's *modus operandi* in making threats and carrying them out with the help of his friends. Here, there is no danger that the jury would punish Berry for his past acts. *See State v. Rainer*, 411 N.W.2d 490, 498 (Minn.1987). The *Spreigl* evidence served to complete the picture of Berry, not to paint another picture.

Also, it was not necessary to show that Schram had indeed snitched. Berry testified that Krocak had told the police about Schram's involvement in writing bad checks and Berry expressed concern that Schram could be picked up for questioning by the police because she frequently visited her boyfriend, Donny, at the Minnesota Correctional Facility at St. Cloud, where he believed the practice was to run a check to see if there was a warrant out on the visitor.

Moreover, any unfair prejudicial effect was lessened by the cautionary instruction given before each incident was admitted, and again when the instructions were given to the jury. In addition, the judge took judicial notice of the fact that no one had been hurt in the Johnson incident.

We hold the trial court properly admitted evidence of the three *Spreigl* incidents.

## II

Appellant argues that the trial court committed reversible error when it failed to suppress a statement made by appellant to Salvog in which appellant implied he had murdered someone previously. Over objection, on grounds of unfair prejudice and failure to give *Spreigl* notice, Salvog was permitted to testify that after he and Wilcox returned from the scene of the murder, Berry told Salvog he wanted to talk to Wilcox alone for a few minutes because, he, Berry, had been pretty shook up the first time he ever killed anybody.

■ The trial court's decision to admit evidence is reviewed under an abuse of discretion standard that is deferential to the trial court. *State v. Naylor*, 474 N.W.2d 314, 317 (Minn.1991). The trial court correctly ruled that *Spreigl* notice was not applicable because Berry's statement was made to a co-conspirator in furtherance of the conspiracy to cover up Schram's murder. *See* Minn.R.Evid. 801(d)(2). The statement was not offered to prove that Berry murdered someone but it was offered to show Berry's knowledge of the Schram murder and his state of mind in covering up the murder. Wilcox and Berry were co-conspirators in Schram's murder, and Salvog was enlisted to help to cover up the murder. The statement was made shortly after Salvog and Wilcox, co-conspirators in the cover-up, had returned from their task of making sure Schram was dead. Thus, the trial court correctly ruled no *Spreigl* notice was necessary.

■ Appellant's more compelling argument is that admitting the statement was highly prejudicial because Berry was not charged with actually pulling the trigger and the inference that Berry had murdered someone previously created the potential for a jury decision on an improper basis. We disagree. The statement did not help Berry, but neither was it unfairly prejudicial to him.

In any event, the likelihood of prejudice was lessened by the two curative instructions given by the judge. In the second curative instruction, set out in part below, the judge specifically stressed that there was no contention that Berry had participated in another murder:

> You may only use the evidence if it aids you in determining the defendant's state of mind at the time he allegedly made the statement. And then only if that aids you in determining defendant's intention prior to the killing of Cindi Schram. *You may not treat it as evidence of another crime having occurred in the past. There is nothing in the record, and the prosecution in no way contends, there is any evidence that the defendant was in any way involved in any other killing.* Therefore, as a matter of law, and you have all sworn to

follow the rules of law, *you as the jury may not say to yourself that the defendant has been in any way involved in any other killing and is therefore more likely to be guilty of this offense. If, during your deliberations anyone makes that argument, you must correct that person.*

(emphasis added).

There is no reversible error; the trial court did not abuse its discretion in admitting Berry's statement to Salvog.

## III

Finally, appellant argues that the evidence is insufficient, as a matter of law, to sustain his conviction. "In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). We will not retry the facts and, in our review of the record, we must view the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.* Further, "[i]f the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed." *Id.*

The state needed to prove that Berry intentionally aided, advised, hired, counseled or conspired with or otherwise procured Wilcox to murder Schram. Under Minnesota Statute section 609.05, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. *State v. Parker,* 282 Minn. 343, 355, 164 N.W.2d 633, 641 (1969); *see also State v. Merrill,* 428 N.W.2d 361, 367 (Minn.1988). Here, the state presented abundant evidence that hours before Schram's death, Berry tried to solicit, in turn, Larson, Salvog, and Wilcox to kill Schram. Berry's solicitation of

Salvog, and of Wilcox, and Wilcox' nodding of his head in agreement was corroborated by another witness.

"Evidence of subsequent acts is competent to prove participation in the criminal acts charged." *State v. Parker,* 282 Minn. at 356, 164 N.W.2d at 641. Through Salvog's testimony, the jury heard about appellant's presence, companionship and conduct in calming down Wilcox after the murder. Appellant admitted he actively participated in certain cover-up activities such as the burning of certain bloodstained clothing and getting rid of the gun. Perhaps the most damning evidence is Berry's unsolicited, voluntary statement to Robert Diedrichs, the jailer dispatcher, Sherburne County Sheriff's Office. Berry told him, "I don't know why I am here, charged, I only told him to shoot her." This evidence of Berry's presence, companionship and actions before and after the crime showed that he had a knowing role in the crime and was, therefore, equally responsible as an aider and abettor under Minnesota Statute section 609.05.

Berry argues that Larson's testimony is suspect because Larson wanted to get back at Berry for setting him up at the party to hit Schram. He further argues that Salvog's credibility is undermined by the fact he received immunity for his testimony, and that Salvog admitted he changed his story several times throughout the investigation. Larson, and Salvog, in particular, were subjected to vigorous cross examination and impeachment by prior inconsistent statements. The jury who heard all the witnesses is in the best position to test credibility.

When the evidence and all reasonable inferences to be drawn are considered in the light most favorable to the verdict, the evidence is overwhelming to sustain Berry's conviction.

Affirmed.

GARDEBRING, Justice (dissenting).

I respectfully dissent as to the admission of the *Spreigl* evidence. Society may be better off with appellant behind bars. He

is a thief, a fence and a drug dealer who carried a gun, had a nasty temper, often threatened his perceived enemies and associated with a group of tough people. The state proved beyond a reasonable doubt that appellant would not make a great next-door neighbor. What the state did not prove so clearly was whether he was involved in the murder of Cindi Ann Schram. In effect, appellant has been sentenced to life in prison for being a scary man.

By affirming appellant's conviction, the majority is allowing the already expansive *Spreigl* doctrine to balloon completely out of control. The result is the precise evil this court has vowed to avoid since *Spreigl* became the law of the state, to wit:

> The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.

*State v. Spreigl*, 272 Minn. 488, 496, 139 N.W.2d 167, 172 (1965) (*quoting* 1 Wigmore, Evidence §§ 193, 194 (3d ed. 1939)). Furthermore, we have said that:

> Evidence of other crimes or bad acts by a defendant is inadmissible to show that the defendant acted in conformity with them or had a propensity to commit violent crimes, but it is admissible for other purposes, such as to show intent, or absence of mistake or accident.

*State v. Rainer*, 411 N.W.2d 490, 497 (Minn.1987) (discussing Minn.R.Evid.Rule 404(b)); *see also State v. Diamond*, 308 Minn. 444, 448, 241 N.W.2d 95, 99 (1976) (evidence admitted to show defendant's relationship to victim). Moreover, evidence of other bad acts "should be excluded where it is merely cumulative and a subterfuge for impugning defendant's character or for indicating to the jury that he is a proper candidate for punishment." *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 284–85 (1967).

The *Spreigl* doctrine is a gloss on Minn. R.Evid. 404(b). That rule provides in pertinent part:

> Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence.

In this case, the trial court, after a detailed analysis, concluded that appellant's prior acts were relevant to show appellant's *modus operandi*. However, I would reverse that conclusion as an abuse of discretion. If appellant's prior bad acts truly are relevant to his *modus operandi*, then we have stretched the concept of *modus operandi* so far that any history of threats or violence becomes proof that a defendant was merely committing a crime in his or her usual manner. The result is that we are effectively repealing Minn.R.Evid. 404(b) and permitting the state to prove guilt by conformance with bad character.

An examination of the *Spreigl* evidence admitted in the present case proves the point:

> (1) Appellant went to Johnson's house to beat him up for being a snitch. When he got there, Johnson wasn't home, and appellant broke items inside the house and apparently fired a gun.

This incident shows that appellant was hot-tempered and acted impulsively on his anger. It does not show that when appellant decided to injure someone he did whatever was necessary to accomplish that goal. He did not go back a second time when Johnson was home. He did not solicit any friends to beat up Johnson. If he had done those things, the majority might be correct. We would have a *modus operandi* of intractable vengeance. Instead, we have evidence of a person talking tough, damaging property, and that's all.

> (2) Appellant apparently threatened to beat Ms. Krocak because she had

snitched on him and break her neck if she ever lied to him again. ·

Ms. Krocak was never injured in any way by appellant. Again, this incident shows appellant has a hair-trigger temper, makes vocal threats about inflicting serious harm, but does not follow through on those threats.

(3) Appellant allegedly grabbed Judkins and intimidated him with a gun for fear that Judkins had brought unwanted attention from county social service officials.

Again, no shots were fired and no punches were thrown. Appellant's temper flared, he talked tough, and he intimidated someone. There is nothing more.

Yet, the trial court and the majority have concluded that those incidents are similar in time, location or *modus operandi* to the killing of Ms. Schram. I frankly fail to see the connection. Taken together, the *Spreigl* incidents show that appellant was hot tempered, impulsive and intimidating. Interestingly, the prosecution's theory of the case was that appellant coolly and methodically arranged for someone else to kill Ms. Schram and that he did not confront her himself. If anything, the *Spreigl* evidence shows that the Schram murder was carried out in a manner diametrically contrary to appellant's *modus operandi.*

There are cases where *Spreigl* evidence is appropriate. *See State v. Landin,* 472 N.W.2d 854 (Minn.1991) (past violence toward objects of defendant's affection relevant in trial for murder of woman who spurned advances); *State v. DeWald,* 464 N.W.2d 500 (Minn.1991) (violent murders occurred during similar residential break-ins three weeks apart); and *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1964) (past holdup used to show identity). In all of those cases, there is a tight nexus in time, location or *modus operandi* between the prior bad acts and the charged crimes. In the present case there is no

nexus at all. The incidents used as evidence in appellant's trial are nothing more than an effort to salvage the state's weak case [1] by proving that appellant had a bad character and acted in conformance with it. That violated Rule 404(b) and poisoned appellant's chance for a fair trial. If such a result is truly the purpose of the *Spreigl* doctrine, the doctrine is in need of a major overhaul.

I dissent.

---

1. I also am bothered by the aspect of the *Spreigl* rule that allows the use of prior bad acts only when the state has a weak case. The strength of the state's case should be irrelevant. Evidence of prior bad acts is either relevant and helpful to the fact finder or it is not. This court should not be in the position of trying to help the state to gain convictions when it cannot do so solely on the evidence. If the state has a weak case, the correct response is an acquittal.