STATE of Minnesota, Respondent,

v.

Charles POGANSKI, Appellant.

No. 46697.

Supreme Court of Minnesota.

Sept. 2, 1977.

Bruce Hartigan, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, David W. Larson and Phebe S. Haugen, Asst. County Attys., Minneapolis, for respondent.

Heard before ROGOSHESKE, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Defendant, Charles C. Poganski, a chiropractor, was convicted of theft by swindle and of conspiracy to commit theft. The basis for the convictions was his submission of bills to the MFA Insurance Companies (MFA) for the treatment of two patients who had falsely reported to MFA that they had been involved in an automobile accident. Defendant claimed that he had actually treated the two patients and did not know that the accident and claimed injuries were fictional.

The issue on appeal is whether defendant was denied a fair trial, under the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by the prosecutor's failure to make available a tape recording of a conversation between defendant and a police officer posing as a prospective patient who had escaped injury in a recent automobile accident but desired to collect an insurance settlement by filing false medical reports. Defendant did not explicitly agree or refuse to participate in the scheme proposed by the undercover agent. He argues that the jury should have been permitted to consider this admittedly "equivocal" evidence as relevant to

the crucial issue of intent, and that the prosecutor's withholding of the tape recording entitles him to a new trial.

Counsel for the state conceded at oral argument that the tape should have been given to defendant pursuant to an agreement entered into between them at the Rasmussen hearing.[1] We need only decide, therefore, whether nondisclosure deprived defendant of a fair trial under the due process clause of the Fourteenth Amendment. The trial court denied defendant's post-trial motion upon its finding that "the conversation was not of an exculpatory nature, or if so, would have had such a negligible effect as to not have affected the result of the trial." We affirm.

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218, the United States Supreme Court held that—

> " * * * the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

The term "material" as used in *Brady* means more than merely relevant; "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976). See, 40 U. of Chi.L.Rev. 112, 126. As stated in *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972):

> " * * * We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' *United States v. Keogh,* 391 F.2d 138, 148 (CA2

---

1. Because of some confusion as to the nature of this agreement, counsel for the state drafted an order for the trial court which conditioned disclosure on the state's use of the tape at trial. The state did not use evidence derived from the tape at trial and, in reliance upon the order, did not turn the tape over to the defense.

Had the new Rules of Criminal Procedure, specifically Rule 9.01, subd. 1(2), been in effect at the time of trial, the prosecution would have been required to disclose defendant's recorded statement without a court order or agreement between counsel.

1968). A finding of materiality of the evidence is required under *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194. A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' *Napue [Napue v. Illinois], supra,* 360 U.S. 264, at 271, 79 S.Ct. 1173, 13 L.Ed.2d 1217."

Application of this admittedly imprecise standard to the facts of this case requires a review of the record as well as a review of the taped conversation, since only in the context of the record as a whole may the materiality of the undisclosed evidence be judged.

Defendant submitted to MFA bills for chiropractic treatment of Ismail and Taha Khaleq on a total of 60 occasions between January 30, 1973, and April 17, 1973. Taha and Ismail informed MFA that the treatments were necessary for injuries sustained in an automobile accident with an insured driver. No accident had, in fact, taken place. Rather, on January 22, 1973, Ismail had persuaded an acquaintance, Pam Posten, to use funds supplied by him to purchase a 3-month insurance policy in her name on an automobile to which he had given her title. On January 29, 1973, Ismail instructed Posten to notify MFA that she had run through a stop sign and had struck an automobile in which three brothers, Taha, Ismail, and Mohammed Khaleq, were riding. Posten reported that all three sustained injuries. Unaware of the fraud perpetrated upon it, the insurance company settled with Ismail for $2,000; with Taha for $2,700; and with Mohammed, who had consulted a doctor other than defendant, for $3,500. Subsequent investigation disclosed the fraud, and on October 25, 1974, Ismail, Taha, and Posten were charged with theft by swindle. Less than 2 months later, police officers executed a search warrant of defendant's office and seized records relating to Ismail and Taha.

Ismail testified that he visited defendant's office a total of four times: On January 31 or February 1, 1973, when he filled out a personal information form but said nothing about whether he was injured or not; on February 4 or 5, when he brought Taha with him and told defendant they were not hurt and needed no treatment; at the end of March, when he brought insurance claim forms for defendant to complete; and, about 1 week after he received a check from MFA dated April 25, 1973, when he and Taha paid defendant $600. Ismail testified that he never received any treatment and could not remember whether defendant took X rays. Taha testified that he saw defendant three times: Once during the first week of February, when he filled out a personal information form and had X rays taken; once approximately 1 week later, when he complained of a cold and defendant gave him a massage; and once in early May, when he went with Ismail to pay defendant. According to Ismail and Taha, defendant advised them to tell the insurance adjuster that they were seeing defendant for treatment every Monday, Wednesday, and Friday.

Ismail testified that he was referred to defendant by a friend named Harvey, who worked as a bartender at the Flame Cafe. Harvey Seliger corroborated this assertion. Seliger testified that he first met defendant at the Flame in the spring of 1971. He saw defendant and his wife approximately 12 times that year, either in the Flame or at a second bar. Seliger testified that defendant had told him he was a chiropractor and that he was interested in patients who were not injured "and someone that he could make money with and the patient could make money." Seliger explained that defendant stated he wanted people who were in accidents and unhurt "because he could prorate the bills or—and then he could submit them and the person would only have to come there once and then they could divide up the money or whatever, I don't know." Defendant gave Seliger his business card.

The inconsistent and contradictory testimony of Ismail and Taha impugned their credibility. Ismail lied about his employment history and about his history of insurance claims. On cross-examination he admitted to some 20 different claims against

insurance companies for various "accidents" across the country, some involving fires, most involving automobile accidents. With respect to the scheme involving defendant, Ismail was charged only with theft and not, unlike defendant, with conspiracy. Evidence supports the inference that Ismail was given favorable treatment by the prosecutor in exchange for his cooperation in the investigation and prosecution of defendant. Taha, like his brother Ismail, has been involved in numerous schemes to defraud insurance companies. He, too, was charged only with theft and not with conspiracy relative to the scheme involving defendant.

A jury, as the sole judge of credibility, is free to accept part and reject part of a witness' testimony. *Kmetz v. Johnson*, 261 Minn. 395, 113 N.W.2d 96 (1962); even "if the jurors believe that a witness has *knowingly and wilfully* testified falsely as to a material fact, * * * they may believe or disbelieve his testimony as to other facts as they deem it worthy or unworthy of belief." *State v. Stevens*, 248 Minn. 309, 313, 80 N.W.2d 22, 26 (1956). In this case, circumstantial evidence supports testimony of the Khaleqs implicating defendant in their fraudulent scheme.

The search of defendant's office revealed a 1973 appointment book and a set of records for Taha and one for Ismail.[2] No X rays were found. Defendant's wife was working in the reception area at the time the search was executed on December 13, 1974, and she helped the officers locate these items. According to one of the officers, Mrs. Poganski explained that she prepared defendant's bills and that the appointment book was her sole source of billing information. The appointment book showed 7 visits by the Khaleqs; she could not explain why the bill charged for 60. At trial, Mrs. Poganski testified that the bookkeeping methods had changed since the time the Khaleqs were patients, and that the method she had described to the officers was the one being used at the time of the search, not the one in use at the time the Khaleqs were patients.[3] She stated that the reason that she could not explain to the officers the discrepancy between the appointment book and the bill was that she only worked part time during the period the Khaleqs were receiving treatment. She had typed up the Khaleqs' bills from information prepared by defendant.

Defendant testified that he "did not go by" the appointment book; most of the items written in it were entered by his wife. According to defendant, the appointment book was used solely to record cash received and to make appointments for those who wished to come in for treatment at a specific time. Defendant stated that he "normally half the time just [used]" the ledger. This was a sheet of paper which he would mark with the date each time either Khaleq came in for treatment. He admitted that the entries on the Khaleqs' ledgers had all been written at one time, explaining that he had copied his previous list to make it more legible for his wife who typed up the bill from it.

The ledger, however, reflected charges for some appointments as if they had been scheduled, although these appointments did not appear in the appointment book purportedly kept for that purpose. Some dates had been listed on Taha's ledger and then crossed out because, according to defendant, Taha "was scheduled to come in on

2. The set of records identified with Ismail Khaleq's name consisted of a "Physician's and Surgeon's Report"; a typewritten billing sheet, a copy of which had been sent to MFA; two sheets of defendant's letterhead paper, referred to by defendant as a "ledger," on which defendant had written the dates of Ismail's visits which corresponded with those on MFA's bill; and a patient's referral form. Taha's records consisted of similar handwritten billing information and a patient referral sheet. No case histories or prognoses were kept on either patient. Despite the absence of such records and the fact that defendant saw 40 to 50 patients weekly, at trial defendant described in detail the Khaleqs' complaints of pain from their visits of 2 years earlier.

3. Under the newer method, two forms, including a yellow cardboard account record, were allegedly used rather than the appointment book. No such forms were found in the Khaleqs' files, however.

those dates and he never showed up." These "scheduled" visits were not in the appointment book. Two other dates, April 13 and 16, were listed on the ledger and not crossed out, although defendant recalled at trial that Taha had not come in on those days either. Taha had earlier testified that he was in Jerusalem on those days visiting his sick father. Other witnesses, as well as Taha's passport, which showed Israeli stamps dated April 13 and 17, corroborated Taha's testimony. Defendant testified that he billed Taha for those days consistent with the customary policy of billing patients who failed to cancel appointments 24 hours in advance. The April 13 and 16 appointments did not appear in the appointment book.

The above-described records of Ismail and Taha were located in the "delinquent files" section of defendant's filing cabinet. Of the approximately 15 sets of records in that section, all but the Khaleqs' carried notices stating that they had been referred to collection agencies. Defendant testified that although he had never received payment from the Khaleqs, he had not referred their files to a collection agency because he had been told that they were in Jerusalem.

No X rays of either Khaleq were found, although defendant recalled having taken six of Taha and more than six of Ismail. Defendant acknowledged the practice of keeping X rays for several years because of the length of time necessary to prosecute a lawsuit. He testified, however, that he had sold the Khaleqs' X rays after about 1½ years, because he believed they were never coming in again. Defendant testified to his belief that he had sold the X rays to a Mr. Johnson who, on his way through town, had telephoned from the bus depot to solicit the sale of old X rays.

Defendant testified that the bill sent to MFA accurately reflected 57 charges for actual treatments and 3 charges for missed appointments. He stated that most of the Khaleqs' office calls were in the evening. Employees at Taha's store testified that Taha was virtually always at the store during the day but that Ismail was present less

often. Mrs. Poganski, who stated that she only worked part time during 1973, testified that she saw the Khaleqs in the office on January 30 and 31; approximately eight times in the evening during February and March; and twice more when they picked up their bills. A friend of defendant's testified that he had seen the Khaleqs at defendant's office on three or four evenings in February or March. One patient of defendant's testified that she had seen them, and Mrs. Poganski, at defendant's office on two evenings in early February. A second patient testified that he had seen them at defendant's office about six or seven evenings in February and March. He testified that he had received treatment 60 or 70 times, although he also testified that it "could have been thirty, thirty-five or forty." He stated that Mrs. Poganski was also present "about half the time or pretty much [every time]."

On this evidence, the jury found defendant guilty of theft and conspiracy. The evidence is sufficient to support its verdict. Defendant's documentation of the submitted bill is insubstantial and the explanations of his record-keeping methods are inconsistent. The testimony of those who claimed to have seen the Khaleqs in defendant's office, viewed in the most favorable light, despite the relationship of some of the witnesses to defendant and despite internal inconsistencies in the testimony, may show more than 7 visits but still shows many fewer than 57. The testimony was only approximate, and almost all of the time the Khaleqs were allegedly seen by others overlap with the times Mrs. Poganski claims to have seen them.

The issue before us is not the sufficiency of the evidence before the jury, however, but whether evidence which the jury did *not* hear would have influenced its verdict. Although the substance of the taped conversation was summarized at the *Rasmussen* hearing, defendant argues that he was inhibited from eliciting testimony about the exculpatory aspects of the conversation by his ignorance of possible inculpatory aspects. Having heard the tape after trial,

defendant now argues that he would have submitted it to the jury had he heard it earlier. He contends that the conversation is relevant to the issue of intent. Defendant concedes that the conversation is "equivocal" on that score, but maintains that we should not presume what effect or weight the jury might accord to it. We view our role on appeal, however, as necessarily involving at least a threshold assessment of the relevance and potential impact of the undisclosed evidence had it been available for development by skilled counsel. Such is the standard of "materiality."

The taped conversation transpired when police officer Paul Stanton met defendant at his office immediately prior to execution of the search warrant. The tape discloses that Stanton told defendant he had been in an automobile accident with a prominent man from Edina, whose insurance company was eager to settle. Stanton said he had not been hurt but wanted to collect some money from the insurance company and had been referred to defendant for that purpose by a bartender at the Flame. During the approximately 15 minutes of recorded conversation, Stanton told defendant at least six times that he was unhurt. Defendant took X rays, saying, "Well, we'll find out, maybe there is [something wrong]." Defendant questioned Stanton about the person who gave Stanton defendant's name, but neither admitted nor disclaimed recognition of such an individual. At the close of their conversation, defendant said, "I want you back in here tomorrow morning * * * 11 o'clock." Stanton asked defendant whether he wanted some money, "a percentage or something like this." Defendant replied, "I just get what I've got coming to me for treating you."

Defendant admits that this evidence would not have been useful for impeachment purposes. Nor would its disclosure have influenced defendant's preparation for trial. Its only use, therefore, would be as substantive evidence at trial.

Whether or not evidence of innocence on one occasion is admissible to rebut evidence of wrongdoing on a separate occasion presents a difficult evidentiary issue.[4] See, Annotation, 90 A.L.R.2d 903.[5] In the instant case, we do not even have evidence of innocence on a separate occasion: The recorded conversation is at *least* as consistent with a willingness to participate in a fraudulent scheme as it is with a refusal to participate. Assuming, arguendo, that evidence of the "equivocal" conversation could have been admitted, we agree with the trial court that its admission would not have affected the jury's verdict. On the facts of this case, the undisclosed evidence was not exculpatory.

Affirmed.

---

4. Whether the refusal to admit this evidence would constitute reversible error would present essentially the same issue as confronts us.

5. The cases cited by defendant in support of its argument that the tape was admissible are not persuasive. In *State v. Stevens*, 248 Minn. 309, 80 N.W.2d 22 (1956), a paternity action, we held it error for the trial court to have ruled inadmissible evidence of statements made by the defendant hours before signing an affidavit of paternity in order to show the intent with which he signed that very affidavit. In the instant case, defendant would argue that his failure to agree explicitly to participation in one fraudulent scheme is indicative of his innocence in a similar fraudulent scheme of 1 year earlier.

*United States v. Matot*, 146 F.2d 197 (2 Cir. 1944), is likewise not in point. The court there ruled admissible evidence of conduct which was part of a single transaction and which shed light upon the intent with which the defendant began the course of conduct. In this case we are dealing with two separate opportunities for wrongdoing.