**STATE of Minnesota, Respondent,**

**v.**

**Lavon Antione JOHNSON, Appellant.**

**No. C4–96–1716.**

Supreme Court of Minnesota.

Aug. 28, 1997.

---

John M. Stuart, State Public Defender, Lyonel Norris, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Susan Gaertner, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty, St. Paul, for respondent.

## OPINION

ANDERSON, Justice.

Appellant, Lavon Antione Johnson, was present in the area of 645 Lafond Avenue in St. Paul, Minnesota on the evening of October 21, 1995 when gunshots were fired into a car of Asian–American youths, paralyzing Bing Xiong (Bing) and killing his girlfriend, 17–year–old Mary Yang (Mary). Johnson, an African–American male who was 17 years old at the time of the shooting, was subsequently identified from a photographic line-up as the shooter. Johnson was indicted for first-degree murder, second-degree murder, first-degree attempted murder, and second-degree attempted murder.

At trial, the defense attempted to prove that another African–American youth, who was also present at the crime scene, was the shooter. Pursuant to this theory, the defense offered reverse *Spreigl* evidence concerning a separate shooting incident involving the other youth, but the court excluded this evidence. The jury found Johnson guilty of first-degree murder and attempted first-degree murder, and the court sentenced Johnson to life imprisonment for first-degree murder and a consecutive 180–month sentence for attempted first-degree murder. On appeal, Johnson raises two grounds for reversal. First, Johnson claims that a new trial is warranted because the district court erred in excluding reverse *Spreigl* evidence concerning the shooting incident involving the other youth. Second, he claims that the witness identifications of him as the shooter were insufficient to support the convictions. We affirm.

On October 21, 1995, at approximately 10:30 p.m., seven Asian–American youths in a car were circling the area surrounding the Hmong Funeral Home Services, Inc. at the corner of Dale Street and Lafond Avenue in St. Paul, Minnesota in search of a parking space. Bing was the driver of the car. He was accompanied by his girlfriend, Mary, his cousin, Fong Xiong (Fong), Tou Chang (Tou), Billi Villi Yang (Billi), Peter Xiong (Peter), and John Vang. Simultaneously, a group of African–American youths and Caucasian youths (645 Lafond youths) was situated in and around the property at 645 Lafond Avenue. These youths included: April Brown–McCoy (April), who resided at 645 Lafond, Aleisha Feiner (Aleisha), who also resided at 645 Lafond, 15–year–old Mac Lesure (Lesure), James Hobbs (James), and several others. Johnson was not present at this time in the evening.

The Asian–American youths and the 645 Lafond youths offered differing accounts of

what occurred that evening. According to April and Aleisha's trial testimony, an argument took place between the Asian–American youths and the 645 Lafond youths, apparently over whether the Asian–American youths could park their car at a parking spot near 645 Lafond. During the altercation, an Asian–American boy called Aleisha a "bitch," an Asian–American boy slapped James in the face, the Asian–American youths threw rocks, everybody was "grabbin' sticks and stuff," and Lesure was hit in the head with a rock. The altercation ended when April's grandfather came out of the house and told everyone who did not live there to leave. After the Asian–American youths left, Lesure used the telephone at 645 Lafond and then rode off on his bicycle. A while later, the 645 Lafond youths saw Johnson knocking on a neighbor's door, and Johnson joined the group.

April testified at trial that when the 645 Lafond youths encountered Johnson, he asked for Lesure, then lifted up his shirt and revealed a gun in the waistband of his pants. April testified that Johnson stated, "I got somethin' for 'em." Subsequently, Lesure rode up on his bicycle and Lesure, Johnson, and Aleisha each had some sticks. The car containing the Asian–American youths returned, and Aleisha and the others said to the Asian–American youths, "what's up." Then, the Asian–American youths' car stopped in the middle of the street, and a couple of Asian–American youths jumped out of the car and started to run towards Lesure, Johnson, and Aleisha. Lesure, Johnson, and Aleisha "started running up towards the car and shootin'." As soon as she heard gunshots, April ran into the house. April testified that she did not see the gun and did not see Johnson hand the gun to anyone.

At trial, Aleisha testified that a few minutes after Johnson joined the 645 Lafond group, Lesure came riding up on his bicycle and said that he had "had some problems with these Asians." Lesure was mad because he had been hit in the head with a rock. Aleisha testified that Lesure showed her and the others that he had a gun in his pants. Within about a minute, the car of Asian–American youths drove up and two

Asian–American youths jumped out and started yelling. Lesure then ran toward the Asian–American youths, and the Asian–American youths took off across the street. Lesure then stood by the car, and when the car started rolling off, he followed behind and fired at it about four times. Aleisha testified that when Lesure was shooting at the car, Johnson was sitting on the curb near Aleisha and did not move toward the car.

April and Aleisha each changed her version of events several times prior to trial. April initially told the police that she had not seen anything. After the shooting, however, April told the police that on the night of the shooting, she saw that Johnson had a gun when he lifted up his shirt. April also identified Johnson from a photo line-up as the one who had done the shooting. Subsequently, though, April told the public defender's investigator that Lesure had the gun and did the shooting. April then told the police that Lesure was responsible for the shooting, but upon further questioning, she stated that it was not Lesure and that it was Johnson. At trial, April admitted that her version of events had changed. She testified that a male caller identifying himself as Johnson had telephoned her approximately three times and told her to say that Lesure had the gun. She testified that she had falsely tried to implicate Lesure in order to keep Johnson from getting into trouble.

Aleisha initially told the police she did not know the identity of the shooter. Subsequently, however, Aleisha identified Johnson as the shooter from a photo line-up, told the public defender's investigator that Johnson was the shooter, and testified before the grand jury that Johnson was the shooter. Aleisha later told the public defender's investigator that the shooter was neither Johnson nor Lesure, but some light-skinned African–American male. Then, Aleisha told the police that Lesure was the shooter. Aleisha's prior grand jury testimony was read into the record at trial. In that testimony, Aleisha stated that after the initial altercation with the Asian–American youths, Lesure called Johnson and told him to "bring the piece and to come quick because he had had some trouble with some Asians." In her grand

jury testimony, Aleisha described Johnson as wearing dark tan pants and a red jacket.

The Asian–American youths offered a different account of what occurred that evening. In his testimony at trial, Bing denied having the initial altercation with the 645 Lafond youths. Tou testified that as the Asian–American youths' car was driving down Lafond, there were African–American people and Caucasian people arguing on the side of the street carrying bats and sticks. Tou thought there was going to be a fight. The Asian–American youths parked their car and got out of the car. Some African–American males approached them and said something indicating that the Asian–American youths should not park there. Tou then heard someone say "he has got a gun," and saw an African–American male taking out a gun toward his right chest area. Tou then ran toward the car, but his companions had closed the car doors as they got in, so he ran approximately three car lengths down the street and stopped "sort of in the middle and towards the end of the side of the street," somewhere around 50 or 60 feet away. Tou then turned back and saw the African–American male with the gun point the gun toward the car, turn around, laugh, and shoot five or six times. Tou recognized the shooter as someone he had seen when he was staying at Boys Totem Town (Totem Town), a juvenile facility, from April to July 1995. He testified that the shooter was wearing a red or maroon jacket.

The day after the shooting, Tou identified Johnson as the shooter from a photo line-up. Tou was shown three different photo line-ups. The first photo line-up did not contain Johnson's picture, and Tou did not make any identification. The second photo line-up contained six individual photos, including two or three persons who had been at Totem Town, as well as other filler photos, but not Johnson's picture. Tou pointed to two or three of the pictures and said he knew the people from Totem Town, but none of them was the shooter. The third photo line-up was computer generated and contained six photos, including Johnson's picture and five filler pictures. The police officer who showed Tou the third photo line-up testified that after

looking at this line-up, "without hesitation" Tou pointed to Johnson and said, "That's the one," meaning that Johnson was the shooter. Tou also made an in-court identification of Johnson as the shooter. The record shows that Tou and Johnson were at Totem Town together for nearly three months.

Billi testified that the Asian–American youths were driving down Lafond Avenue, noticed the 645 Lafond youths on the side of the street, then drove around and came back to get a closer look at what the 645 Lafond youths were doing. The car stopped and all of the Asian–American youths jumped out of the car except Fong, Mary, and Peter. They walked up to the curb to see what the 645 Lafond youths wanted and then Billi heard someone yell "he's got a gun." Billi then saw someone run out with a gun. Billi testified that events happened too quickly for him to see what the person with the gun was wearing, but he recognized the person holding the gun as Johnson. Billi ran back to the car and got in. He then heard someone laughing and ducked down. Billi looked back to see what was going on because he "thought it was all a joke about the gun," but Johnson started firing the gun. Billi testified that he recognized Johnson as someone he knew at Totem Town.

On the night of the shooting, Billi told the police that the shooter was an African–American male, aged 14 to 15 years of age, 5'5" in height, with a skinny build, wearing a red waist-length jacket with white stripes and dark colored pants. At the time of the offense, Johnson was a 17–year–old African–American male with a medium complexion who weighs 145 pounds and is 5'9" in height. Billi did not tell the police on the night of the shooting that he recognized the shooter. However, Billi identified Johnson from a photo line-up the day after the shooting. Of the three photo line-ups that the police showed to Tou, Billi was shown the first and the third line-ups. Billi did not make an identification from the first photo line-up. Billi saw the third photo line-up, and after a maximum of five seconds, he pointed to Johnson's picture and said, "That's the one." Tou and Billi viewed the photo line-ups separately and did not have an opportunity to confer before

either identified Johnson from the third photo line-up. Billi also made an in-court identification of Johnson as the shooter.

Fong testified that he stayed in the car with Mary. He looked out of the back window and saw a person in a red jacket holding a gun with a big handle and pointing it at the car. The person pulled the gun up and started shooting. Fong testified that it was too dark for him to see the shooter's face.

Bing, the driver of the car, testified that he was not involved in any fights or arguments. He testified that the group of Asian–American youths was cruising around and that Peter wanted to go to the funeral home to get some money from his father. Bing testified that he parked the car and got out to go to the funeral home, and there was a whole bunch of commotion. He saw a person pull out a gun, got back into the car, looked around to see if everyone was in the car, looked back, and saw some person cocking a gun. Then, he put the car in drive, started to drive out of the parking area, and heard five or six gunshots and somebody laughing. He then felt numbness and told his friends that he was shot. Bing had been shot behind his right shoulder and is permanently paralyzed from the chest down. Mary, seated next to Bing, was shot three times and died as a result of her wounds. The police recovered the gun used in the shooting, a .22 caliber semi-automatic pistol.

Two residents of 657 Lafond, which is two houses West of 645 Lafond, also testified at trial as to the events that occurred on the evening of October 21, 1995. Timothy Skottegaard testified that he looked out of his bedroom window and saw four or five Asian–American persons hop out of a car like they were confronting the youths at 645 Lafond. After a lot of hollering and arguing, the Asian–American persons got back into their car and proceeded to pull in front of his house. The people in the car were all looking behind them like somebody was talking to them. Then, another teenager came from the corner of his house. Skottegaard could see the teenager clearly because he stopped right at the street light in front of his house. The teenager was trying to say something to the Asian–American persons. The teenager looked like he was going to turn and walk away, but he suddenly turned around and pulled out a gun and started shooting at the car. As the car was trying to get away, the teenager followed the car in a quick jog. The teenager was wearing dark pants and a red oversized jacket like a "Starter" jacket with a design on it like stripes. Skottegaard could not really see the teenager's face, but under the street lights, the teenager "looked more of an Asian-type person" with short, dark hair.

Victoria Skottegaard, also a resident of 657 Lafond, testified that she looked out of the window and saw a bunch of kids and the occupants of a car having some sort of confrontation. The car started moving and one person was still yelling at the people in the car. She was looking at the car when she heard the first gunshot, and she watched as five additional gunshots were fired. The shooter was wearing a red and white jacket and dark pants. Due to the yellow color of the street light, Victoria Skottegaard could not tell what race the shooter was, but she believed she saw a short, short-haired male.

Johnson was arrested and indicted for first-degree murder, second-degree murder, first-degree attempted murder, and second-degree attempted murder. He pleaded not guilty to all charges. At the omnibus hearing, the district court ordered that certain statements made by Johnson during his interrogation by the police would not be admissible as substantive evidence at trial. The court, however, denied the defense's motion to exclude the photo line-up identifications. The defense's theory at trial was that Lesure was the shooter. The defense offered reverse *Spreigl* evidence concerning a June 15, 1994 shooting incident involving Lesure, but the court excluded this evidence. The jury found Johnson guilty of the first-degree murder of Mary Yang and the attempted first-degree murder of Bing Xiong. The court sentenced Johnson to life imprisonment for first-degree murder and a consecutive 180-month sentence for attempted first-degree murder.

In this appeal, Johnson first claims that a new trial is warranted because the district court erred in excluding reverse *Spreigl* evi-

dence concerning a 1994 shooting incident involving Lesure. Second, he claims that the witness identifications of him as the shooter were insufficient to support the convictions. We conclude that the district court did not abuse its discretion in excluding the reverse *Spreigl* evidence and that the evidence was sufficient to support Johnson's convictions; therefore, we affirm.

## I.

We first address Johnson's reverse *Spreigl* claim. Johnson argues that the district court erred in excluding from trial reverse *Spreigl* evidence concerning a 1994 shooting incident involving Lesure, a 15–year–old African–American male who also was present at 645 Lafond on the night of the shooting. According to three police reports, on the evening of June 15, 1994, a woman flagged down a squad car and told the police that she had been driving in the area of Lafayette Avenue and University Avenue in St. Paul, Minnesota when five or six gunshots were fired at her car. The intersection of Lafayette and University is approximately 20 blocks from Lafond Avenue. The victim described the suspects as five or six African–American males on bicycles. A second victim described the shooter as an African–American male, 14 years old, 5'5" in height, wearing a striped shirt. The victims named in the reports were Sarn Samouen, Yang Mao, and a three-year-old child.

A short time after the police were flagged down, the police were driving on Mount Airy Road and spotted five African–American male juveniles on bicycles. The police ordered the juveniles to stop, which they did. The police took Yang Mao to the group of juveniles that the police had stopped, and she identified them as the juveniles she had seen earlier. One of the juveniles, later identified as Lesure, appeared to the police to be "extremely nervous." When approached by the police to be interviewed and possibly searched, Lesure started running, was chased by the police, and apprehended. He was wearing a blue striped shirt. The time

of arrest was approximately 9:40 p.m. The police found a loaded .22 caliber long rifle automatic handgun approximately 25 feet from where Lesure was apprehended. Lesure stated that he had found the gun a few weeks earlier, but said that he did not shoot the gun. The police interviewed the remaining four juveniles, none of whom appear to have been appellant Johnson. The other youths stated that they had just met up with Lesure. These youths were released at the scene. Lesure, however, was charged in that incident for the crime of dangerous discharge of a firearm, but the state dismissed this charge. Lesure did admit to being a juvenile in possession of a pistol.

At trial, the defense made an offer of proof of evidence that Lesure had been involved in the 1994 shooting incident and the district court held a hearing outside the presence of the jury.[1] The court ruled that it was inappropriate to admit evidence of the 1994 shooting incident, stating:

> I agree with the State that the incidents here are not so clearly similar as to permit the use of the 1994 incident as Spriegl [sic] evidence in this case. Certainly if the state was offering this incident against Mr. Johnson, I would not permit its admission and I believe that it is not appropriate in this case to allow the defense to use the 1994 incident as reverse Spriegl [sic].

Johnson argues that the court erred when it excluded the evidence of the 1994 shooting incident involving Lesure and that this error deprived him of a fair trial.

■ Evidentiary rulings generally rest within the district court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). Under rule 404(b) of the Minnesota Rules of Evidence, evidence of another crime, wrong, or act is not admissible at trial to prove the character of a person to show action in conformity therewith. Minn. R. Evid. 404(b). Evidence of another crime, wrong, or act may be admissible, however, for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

---

1. The state and the defense stipulated that if the police officers were called to testify about the 1994 shooting incident, their testimony would be the same as that documented in the police reports.

knowledge, identity, or absence of mistake or accident. *Id.* Such evidence shall not be admitted in a criminal prosecution unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence. *Id.*

■ Pursuant to rule 404(b), the state may seek to introduce evidence of a defendant's other crimes or misconduct to prove that the defendant committed the crime in question. *See State v. Moorman,* 505 N.W.2d 593, 600 (Minn.1993); *see generally State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). Evidence of a defendant's other crimes, wrongs, or acts (referred to as "*Spreigl*" evidence) is admissible upon showing: (1) clear and convincing evidence that the defendant participated in the *Spreigl* incident; (2) that the *Spreigl* evidence is relevant and material to the state's case; and (3) that the probative value of the *Spreigl* evidence outweighs its potential for unfair prejudice. *State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991) (citation omitted); *see also State v. Bolte,* 530 N.W.2d 191, 196–97 (Minn.1995) (detailing procedural requirements and safeguards governing other-crime evidence). When it is unclear whether *Spreigl* evidence is admissible, the defendant should be given the benefit of the doubt and the evidence should be excluded. *Bolte,* 530 N.W.2d at 197 (citing *Spreigl,* 272 Minn. at 495, 139 N.W.2d at 172).

■ Also pursuant to rule 404(b), a *defendant* may seek to introduce evidence of other crimes or misconduct of a *third person* to prove that the third person, rather than the defendant, committed the crime charged. The defendant's offer of proof in this situation is referred to as "reverse *Spreigl*" evidence. *See generally State v. Willis,* 364 N.W.2d 498 (Minn.App.1985). The leading case regarding reverse *Spreigl* evidence is *State v. Bock,* 229 Minn. 449, 39 N.W.2d 887 (1949). In *Bock,* this court stated that a defendant "should * * * have the right to show that crimes of a similar nature have

been committed by some other person when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime charged against him." *Id.* at 458, 39 N.W.2d at 892. In *State v. Deans,* this court stated:

> If * * * the conduct of a third party * * * is an issue and if the evidence of 'other crimes, wrongs, or acts' by the third party is not offered to prove the third party's character as a basis for an inference as to his conduct but instead is offered to prove the conduct of the third party without any need to infer his character, then the evidence is admissible.

356 N.W.2d 674, 676 (Minn.1984). The foundational requirements for reverse *Spreigl* evidence are the same as for *Spreigl* evidence. *See generally* 11 P. Thompson, *Minnesota Practice,* § 404.06 (2d ed.1992), at n.3.

■ The first requirement for admission of Johnson's reverse *Spreigl* evidence is clear and convincing evidence that Lesure participated in the 1994 shooting incident. "Clear and convincing" requires more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). The unrebutted testimony of three police officers clearly and convincingly shows that Lesure participated in the 1994 shooting incident. Lesure ran from the police, admitted owning the .22 caliber handgun, and when apprehended was wearing a shirt which matched a victim's description of the shooter. At the hearing on the defense's motion, the state conceded that the defense had established by clear and convincing evidence that Lesure had possessed a pistol on the date of the incident. The evidence of Lesure's participation in the incident is further supported by the fact that Lesure was charged for the crime of dangerous discharge of a firearm and admitted a lesser offense.[2]

2. This court has declined to bar *Spreigl* evidence of other crimes which either were prosecuted and dismissed, or were not prosecuted at all. *State v. Kasper,* 409 N.W.2d 846, 847 (Minn. 1987); *see, e.g., State v. Moorman,* 505 N.W.2d 593, 602 (Minn.1993) (holding that four *Spreigl*

incidents were proven by clear and convincing evidence and were properly admitted when in first incident, charge was dismissed in exchange for guilty plea to charge arising from second incident; third incident was not charged; and in fourth incident, identity was not in doubt);

The second, and in this case the more difficult, requirement for admission of Johnson's reverse *Spreigl* evidence is that the evidence be relevant to Johnson's case. Our *Spreigl* cases are instructive on this point. To satisfy the "relevant and material" requirement when *Spreigl* evidence is offered to establish the identity of the perpetrator, the *Spreigl* incident must be similar to the charged offense either in time, location, or modus operandi.[3] *Landin*, 472 N.W.2d at 859. This court will readily uphold the admission of so-called "signature" crimes to prove the identity of the perpetrator; however, a *Spreigl* crime need not be a "signature" crime provided that it is sufficiently or substantially similar to the crime charged. *State v. Cogshell*, 538 N.W.2d 120, 123–24 (Minn.1995). Absolute similarity between the *Spreigl* incident and the charged offense is not required. *Landin*, 472 N.W.2d at 860. The greater the similarity between the *Spreigl* incident and the crime charged, however, the greater the likelihood that the *Spreigl* incident is relevant. *State v. Rainer*, 411 N.W.2d 490, 497 (Minn.1987).

There are certain similarities between the 1994 shooting incident involving Lesure and the shooting incident at 645 Lafond. The incidents occurred approximately 20 blocks apart on the streets of St. Paul at around 9:00 or 10:00 at night. Both incidents involved shooting at persons of Asian–American descent. The modus operandi, shooting five or six gunshots into a car with a .22 caliber handgun while accompanied by a group of juveniles, was similar in both incidents. But, as the state points out, there are also differences between the two incidents which provide a reasonable basis for exclusion. The shooting at 645 Lafond was apparently a retaliatory act in connection with a prior altercation. Conversely, the shooting

incident involving Lesure was apparently a random act. In addition, the incidents occurred 16 months apart. In *Cogshell*, we stated that an offense committed 15 months earlier was "clearly not closely related to the crime charged in temporal terms." 538 N.W.2d at 124. *Cf. Bock*, 229 Minn. at 458, 39 N.W.2d at 892 (reversal warranted when, in defendant's prosecution for forged checks, reverse *Spreigl* incidents occurred on same day as crime charged; forged checks used in reverse *Spreigl* incidents were identical to crime charged as to date, payee, and payer; and method of operation in reverse *Spreigl* incidents was identical with that allegedly used in crime charged).

Johnson points out that in some of our recent decisions we have upheld the admission of *Spreigl* evidence when the similarity between the *Spreigl* incident and the crime charged was at least as great as in the case at bar. *See, e.g., State v. Lewis*, 547 N.W.2d 360, 362–64 (Minn.1996); *Cogshell*, 538 N.W.2d at 124. However, in those cases we upheld the decision of the district court because we concluded that, even though other district courts might have exercised their discretion differently, there was no abuse of discretion in admitting the evidence. *See Lewis*, 547 N.W.2d at 363–64; *Cogshell*, 538 N.W.2d at 124. In keeping with our standard of review, while the case at bar is close, we will not supplant our judgment for a reasonable exercise of the district court's discretion. We conclude that the court did not clearly abuse its discretion in excluding on relevancy grounds the reverse *Spreigl* evidence of the 1994 shooting incident involving Lesure.

## II.

We next address Johnson's insufficiency of the evidence claim. Johnson con-

---

*State v. Rainer*, 411 N.W.2d 490, 496–97 (Minn. 1987) (holding that clear and convincing evidence that defendant committed acts alleged in six apparently uncharged *Spreigl* incidents existed when there was eyewitness testimony, there was no rebutting testimony, and the identity of the participants was not in doubt); *State v. Coleman*, 373 N.W.2d 777, 781–82 (Minn.1985) (affirming admission of evidence of defendant's participation in two other apparently uncharged robberies even though witness identifications of

defendant as perpetrator "show[ed] some uncertainty").

3. This court has held that district court is permitted some discretion in determining relevancy, and that the other crime be similar in some way—either in time, location, or modus operandi—although this " 'is not an absolute necessity.' " *State v. Kumpula*, 355 N.W.2d 697, 702 (Minn.1984) (quoting *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983)).

tends that the evidence at trial was insufficient to sustain the jury's verdict because the verdict was based upon the testimony of eyewitnesses, which testimony was unreliable under the circumstances. In reviewing a claim of insufficiency of the evidence, this court upon review is limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). This court cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.* If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, this court will uphold the jury's verdict. *Id.*

 Two eyewitnesses, Tou and Billi, testified at trial that Johnson was the shooter at 645 Lafond on the evening of October 21, 1995. Both Tou and Billi also identified Johnson as the shooter from a photo line-up shown to them on the day after the murder. This court has held that in order to support a conviction, an identification need not be positive and certain; rather, the identification can be sufficient if a witness testifies that in the witness' belief, opinion, and judgment, the defendant is the person whom the witness saw commit the crime. *State v. Daniels,* 361 N.W.2d 819, 827 (Minn.1985). The credibility of individual witnesses and the weight to be given to each witness' testimony are issues for the jury to determine. *State v. Bliss,* 457 N.W.2d 385, 390 (Minn.1990) (citing *Rainer,* 411 N.W.2d at 495). It is a well-established rule that a conviction can rest upon the testimony of a single credible witness. *Id.*

The jury could have believed Tou's testimony that he saw an African–American male take out a gun from his right chest area, that he saw the male point the gun toward the car and shoot the gun five or six times, that he recognized the shooter as someone he had seen at Totem Town several months before, that the shooter was wearing a red or maroon jacket, and that the shooter was Johnson. Tou's testimony is consistent with his statement to the police on the night of the shooting when he told the police he could identify the shooter as someone who had been at Totem Town with him. Tou's in-court identification is also consistent with his identification of Johnson as the shooter from a photo line-up the next day.

The jury could also have believed Billi's testimony that he recognized Johnson as someone he knew from Totem Town and that Johnson was the shooter. When the police questioned Billi shortly after the shooting, he did not disclose to the police that he had recognized the shooter; but the next day, he identified Johnson as the shooter from a photo line-up. Billi's in-court identification of Johnson is consistent with his prior identification of Johnson in the photo line-up.

 Johnson points out that Tou and Billi had only a limited opportunity to observe the shooter. This court has noted that "eye witness identification made upon fleeting or limited observation at the time of a crime is not reliable and in the absence of corroboration should not be the basis for conviction." *State v. Spann,* 287 N.W.2d 406, 407–408 (Minn.1979). Tou's and Billi's identification of Johnson as the shooter is corroborated by other evidence which supports its reliability. One persuasive corroborating fact is that Johnson admits he was at the scene of the shooting. In addition, it is uncontested that Johnson was a resident of Totem Town and that Tou and Billi could have recognized him from having been there at the same time.[4] Tou's and Billi's identifications are also corroborated by the fact that, even though April and Aleisha changed their version of events several times, three days after the shooting each of them was shown the same photo line-up that was shown to Tou and Billi and each

---

4. *See State v. Zernechel,* 304 N.W.2d 365, 366 (Minn.1981) (affirming conviction when victim immediately recognized her attacker as former tenant of apartment building); *State v. Palm,* 299 N.W.2d 740, 741 (Minn.1980) (holding that identification of defendant was sufficient when victim instantly recognized defendant as someone she had seen numerous times in small town).

identified Johnson as the shooter. In addition, April testified at trial that she had seen Johnson with the gun immediately before the shooting and that she did not see him hand the gun to anyone else.

Tou's testimony that the shooter was wearing a red or maroon jacket was corroborated by other evidence. Fong, Timothy Skottegaard, and Victoria Skottegaard all testified that the shooter was wearing a red jacket. One of the police officers testified that on the night of the shooting, Billi told him that the shooter was wearing a red jacket. Moreover, Aleisha testified before the grand jury that Johnson was wearing a red jacket on the night of the shooting and was the shooter. Finally, Tou's testimony that Johnson took out a gun from his chest area is corroborated by April's testimony that Johnson had a gun shortly before the shooting occurred. There is ample corroborating evidence to sustain a jury's conclusion that Tou's and Billi's identifications of Johnson as the shooter were reliable even if Tou and Billi had only a fleeting or limited opportunity to observe the shooter.

In further support of his argument that the evidence was insufficient to support his convictions, Johnson points to the discrepancies in the testimony of the various witnesses. However, "[a] jury, as the sole judge of credibility, is free to accept part and reject part of a witness' testimony." *State v. Poganski*, 257 N.W.2d 578, 581 (Minn.1977). "Inconsistencies or conflicts between one state witness and another do not necessarily constitute false testimony or a basis for reversal." *Daniels*, 361 N.W.2d at 826. The jury could have believed that April lied prior to trial when she said that Lesure was the shooter because she felt threatened or scared by Johnson's attempts to have her implicate

Lesure. The jury could have relied on April's testimony at trial that Johnson had the gun shortly before the shooting.[5] The jury could have disbelieved Aleisha's testimony at trial that Lesure was the shooter. Each of the witnesses in this case was subject to cross-examination, during which the inconsistencies and discrepancies in his or her testimony were presented to the jury. The jury was properly instructed in how to evaluate the witnesses' credibility.

The evidence in this case could reasonably lead the jury to conclude beyond a reasonable doubt that on October 21, 1995, Johnson fired the shots that paralyzed Bing Xiong and killed Mary Yang. We conclude that the evidence was sufficient to sustain the convictions.

Affirmed.

TOMLJANOVICH, Justice (concurring specially).

I concur with the result reached by the majority, but write separately to express my concern about the standards of determining the admissibility of "reverse *Spreigl*"[1] evidence.

Although I agree that the foundational requirements for admissibility of reverse *Spreigl* evidence are identical to those foundational requirements for admissibility of *Spreigl* evidence, I disagree with the conclusion reached by both the majority and the dissent that the analyses within each foundational requirement for admissibility of reverse *Spreigl* evidence are the same as the analyses within each foundational requirement for admissibility of *Spreigl* evidence. Whereas *Spreigl* evidence is offered to show that prior crimes committed by the *defendant* make it more likely that the defendant

---

5. *See State v. Triplett*, 435 N.W.2d 38, 44–45 (Minn.1989) (holding that jury could have relied upon testimony of witness, even though evidence showed that she used drugs, lied to police, and forged checks); *Poganski*, 257 N.W.2d at 580–81 (holding that jury could believe witness' testimony implicating defendant, even though witness admitted to submitting false insurance claims and witness received favorable treatment from prosecutor in exchange for cooperation).

1. *Spreigl* evidence encompasses "other crimes" committed by the defendant. *See generally State*

*v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). Reverse *Spreigl* evidence encompasses "other crimes" committed by third parties. *See State v. Robinson*, 536 N.W.2d 1, 2 n. 1 (Minn. 1995); *see generally State v. Willis*, 364 N.W.2d 498 (Minn.App.1985). Because evidence of "other crimes" committed by third parties is not the reverse of evidence of "other crimes" committed by the defendant, I feel the better terminology is "other-crime evidence" and "third-party crime evidence."

committed the crime for which the defendant is charged, *see State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965), reverse *Spreigl* evidence is offered to show that prior crimes committed by *third parties* make it less likely that the defendant committed the crime for which the defendant is charged, *see State v. Bock,* 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). Because the purposes for which the two types of evidence are offered are so divergent, I am unconvinced that the same standards should apply for admission of both *Spreigl* and reverse *Spreigl* evidence.

The majority correctly states that the party proffering "other-crime" evidence must show by clear and convincing evidence that the "other crime" has been committed; that evidence of the "other crime" is relevant and material to a party's case; and that the probative value of the "other-crime" evidence outweighs its potential for unfair prejudice. *See State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991). The majority also is correct in asserting that these foundational requirements apply whether the party offering the evidence is the state or the defendant. Both the majority and dissent incorrectly assume, however, that the determinations within each of these three requirements are the same regardless of whether the party offering the evidence is the state or the defendant. A rather obvious example of the inherent difference between the determinations within each of the requirements occurs within the first requirement: Whereas the state must show by clear and convincing evidence that the *defendant* participated in the "other crime," *see State v. Billstrom,* 276 Minn. 174, 179, 149 N.W.2d 281, 285 (1967); the defendant must show by clear and convincing evidence that someone *other than the defendant* committed the "other crime," *see State v. Willis,* 364 N.W.2d 498, 500 (Minn.App.1985). Likewise, there is an inherent difference between the determination of whether "other-

crime" evidence is relevant and material to the party's case.

When the state is offering "other-crime" evidence, it is attempting to show that prior crimes committed by the defendant make it more likely that the defendant has committed the crime for which he or she is charged. Because evidence of all prior crimes committed by the defendant make it more likely that the defendant committed the crime for which he or she is charged, all "other-crime" evidence is relevant. *See* Minn. R. Evid. 401; *Spreigl,* 272 Minn. at 495–96, 139 N.W.2d at 172; *see also* 1A John H. Wigmore, *Evidence* § 58.2 (Tillers rev. ed.1983).[2] Because the Minnesota Rules of Evidence generally prohibit the use of "other-crime" evidence for the purpose of showing subsequent conforming behavior, however, the state must show that the "other crime" fits within one of the many exceptions to this general prohibition. *See* Minn. R. Evid. 404(b). The state also must show that the probative value of this "other-crime" evidence substantially outweighs its danger of causing unfair prejudice. *State v. Frisinger,* 484 N.W.2d 27, 32 (Minn. 1992). As such, we allow evidence only of those "other crimes" that are substantially similar to the crime for which the defendant is on trial. *State v. Cogshell,* 538 N.W.2d 120, 123–24 (Minn.1995). When it is the state that proffers evidence of "other crimes" committed by the defendant, therefore, the question is not so much one of relevancy as it is one of legal admissibility. Although relevant, "other-crime" evidence generally is inadmissible because we fear that juries will unfairly punish the defendant for past acts. As such, we allow evidence of "other crimes" only when those crimes are sufficiently similar to the charged crime to figuratively tip the probative side of the equation past the unfairly prejudicial side.

---

**2.** As we noted in *Spreigl:*

That such former misconduct is relevant, i.e., has probative value to persuade us of the general trait or disposition, cannot be doubted. * * * It may almost be said that it is because of this indubitable relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and

inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.
272 Minn. at 495–96, 139 N.W.2d at 172 (citation omitted).

When it is the defendant who proffers "other-crime" evidence, however, the analysis centers not on the unfairly prejudicial nature of otherwise relevant evidence, but on the issue of relevance itself. Unlike "other crimes" committed by the defendant, "other crimes" committed by third parties typically are irrelevant to the determination of whether the defendant committed the crime for which he or she is charged. As a general matter, evidence of other murders, burglaries, robberies or rapes committed in the same city, county, state or country do not make it more or less likely that a certain criminal defendant committed the murder, burglary, robbery or rape for which he or she is charged. As such, evidence of "third-party crimes" generally will be inadmissible, not because we fear such evidence will unfairly prejudice a jury, but because evidence of "third-party crimes" makes it neither more likely nor less likely that the defendant committed the crimes for which he or she is charged. *See* Minn. R. Evid. 401. That all changes, however, when the "third-party crime" is so similar to the one for which the defendant is charged that we begin to question whether the state has charged the proper person. *See Bock*, 229 Minn. at 458, 39 N.W.2d at 892. In those instances, we allow the defendant to offer evidence of a "third-party crime" for the purpose of casting doubt on the state's claim. *Id.* Unlike evidence of "other crimes" committed by the defendant, which are always relevant, evidence of "other crimes" committed by third parties becomes relevant only when the similarity of the "third-party crime" to the crime for which the defendant is charged is such that it can be inferred that the same person who committed the "third-party crime" also committed the crime for which the defendant is charged.

Before a court can properly determine the relevance and materiality of "other-crime" evidence, therefore, it must identify the party proffering the evidence. If the party proffering the evidence is the state, the question is whether the "other crime" was sufficiently similar to the charged crime to ensure that the "other crime's" probative value substantially outweighs its danger of unfair prejudice. If the party proffering the evidence is the defendant, however, the question is whether the "third-party crime" was so similar to the charged crime that it can be inferred that the third party also committed the crime for which the defendant is charged. Because I agree that the "other crime" offered by the defendant in this case was not so similar to the charged crime that it can be inferred that the third party also committed the crime for which the defendant was charged, I join the result reached by the majority.[3]

Despite this conclusion, I cannot agree with either the majority or dissent in applying a rule whereby a criminal defendant can establish the relevance of a "third-party crime" by showing only that the "third-party crime" is "substantially similar to the crime charged." Crime statistics demonstrate the existence of many similar crimes, closely related in time, committed by many unrelated persons. In the case of a drug-related murder committed with a handgun at night in a large city, for example, a creative defense attorney might be able to find any number of "substantially similar" murders committed within any given area and time. Without more distinguishing characteristics, such "substantial similarities"—although sufficient to increase the probative value of already relevant evidence—do not magically transform otherwise irrelevant evidence into relevant evidence.

I do not feel it is necessary at this time to define the appropriate standard for determining when "third-party crimes" become relevant. At the same time, I feel it is necessary to accentuate the differences between the admissibility requirements for evidence of "other crimes" committed by the defendant and "other crimes" committed by third parties. Failure to recognize such distinctions not only will allow criminal defendants to parade every "substantially similar" crime before the jury for the purpose of casting doubt on the defendant's guilt, it will

---

3. At no time did the defendant offer proof that the act of using a .22 caliber handgun to shoot five or six bullets into a vehicle filled with Asian– Americans was so unusual or unique to provide an inference that the third party also committed the crime for which the defendant was charged.

serve the interests of neither justice nor efficiency. As a result, I can join the majority in its result only.

PAGE, Justice (concurring specially).

I join in Justice Tomljanovich's special concurrence.

GARDEBRING, Justice (dissenting).

I respectfully dissent because I disagree with the majority's determination that the reverse *Spreigl* evidence is not relevant to Johnson's case. I would hold instead that the reverse *Spreigl* evidence is sufficiently similar to the offense in question that it should have been admitted.

A defendant has the right to show that crimes of a similar nature have been committed by some other person in order to cast doubt on the defendant's identification as the person who committed the crime charged against the defendant. *State v. Bock,* 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). As the majority has stated, the foundational requirements for a defendant seeking to introduce other crimes evidence is the same as that required to support the state's introduction of "other crimes" evidence against the defendant. One of those foundational requirements is that the evidence be relevant and material to the case, that is, the *Spreigl* incident must be similar to the charged offense either in time, location or modus operandi. *See State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991).

The similarities between the reverse *Spreigl* incident the defendant here sought to introduce and the charged offense are striking. Both occurred on the streets of St. Paul in the late evening; both involved shooting at Asian individuals who were not known to the perpetrator; and both involved shooting five or six gunshots into a carload of Asian people with a .22 caliber gun while accompanied by a group of juveniles. Although the incidents were not particularly close in time, 16 months apart, they were not so far apart as to render the other similarities meaningless. The only difference between the charged offense and the prior offense was that the prior offense was a random act, while the charged offense was apparently a retaliatory act for a prior altercation. I do not believe this single difference provides a reasonable basis to exclude the reverse *Spreigl* evidence.

This court has allowed the state to introduce, *against* a defendant, "other crimes" evidence involving much less similarity to the charged crime than that presented here. In *State v. Cogshell,* 538 N.W.2d 120 (Minn. 1995), a prosecution for selling crack cocaine, the court upheld the admission of a prior conviction of the defendant for selling crack because both the prior incident and the charged offense involved the selling of crack in the same general area of St. Paul, with the same method of packaging. *Id.* at 124. This was allowed despite the fact that such packaging is the standard method of packaging crack cocaine and that many sales of the drug occur in the same area every day. *Id.*

In *State v. Lewis,* 547 N.W.2d 360 (Minn. 1996), a prosecution for first-degree felony murder in the course of a robbery, the court upheld the admission of prior convictions of the defendant for other robberies because both the charged offense and the prior offenses were all robberies or attempted robberies, were street crimes and were committed by a group, and all involved randomly-selected victims and the gratuitous infliction of injury or attempted infliction of injury and the use of a getaway car. *Id.* at 364. At the same time, however, the defendant's involvement in the crimes was quite different: in the prior offenses he was merely the getaway driver, while in the charged offense he was the main perpetrator. *Id.* at 365 (Gardebring, J., dissenting). Moreover, the offenses occurred in different cities, at different times of the day, more than three years apart, and involved entirely different types of weapons. *Id.* at 361, 365.

I have registered my disagreement with the outcome of both of these cases before, *Cogshell,* 538 N.W.2d at 124; *Lewis,* 547 N.W.2d at 365 (dissenting opinions of Gardebring, J.), as well as with other cases where the similarities between the charged offense and the prior offenses by the defendant were equally weak. *See State v. Walsh,* 495 N.W.2d 602, 607 (Minn.1993); *State v. Berry,* 484 N.W.2d 14, 19 (Minn.1992) (dis-

senting opinions of Gardebring, J.). But given that these cases create the rule that binds the court today, we should at the very least apply that rule evenhandedly, treating defendants the same as we do the state when it comes to the introduction of other crimes evidence.

The majority relies on the discretion afforded to the trial courts in making evidentiary rulings, and appropriately so. But the rules for determining when that discretion is abused should be the same for both sides in a criminal matter, the state and the defendant. We simply should not say the trial court is correct in allowing the introduction of marginally relevant evidence that supports the state's case and excluding evidence, which is more relevant, when it supports the defense position.

I believe that the trial court in this instance erred, and the error was not harmless. I would therefore reverse.